Daniel P. Jordan III, CHIEF UNITED STATES DISTRICT JUDGE
Plaintiffs seek an order declaring the ob-gyn requirement of House Bill 1390 facially unconstitutional and clarifying that the Court's previous Order [190] enjoins that law's admitting-privileges requirement statewide, not only as applied to Plaintiffs. They have thus moved to clarify [192] and for judgment [197]. For their part, Defendants moved [199] to exclude certain opinions from Plaintiffs' expert witnesses.
For the reasons that follow, the Court grants Plaintiffs' Motion to Clarify [192] and will modify its injunction to reflect that House Bill 1390's admitting-privileges requirement is enjoined statewide, but it denies Plaintiffs' request [197] for an order declaring the ob-gyn requirement facially unconstitutional. To make that claim, Plaintiffs must show that the law creates a substantial obstacle to the right to choose for a large fraction of women for whom the law is relevant. Yet since the law was enacted, the number of abortions Plaintiffs perform has increased by 17%.
I. Background and Procedural History
In April 2012, the Mississippi Legislature passed House Bill 1390 ("HB 1390" or "the Act"), which required that all physicians associated with an abortion facility "have admitting privileges at a local hospital" and "be board certified or eligible in obstetrics and gynecology." Miss. Code Ann. § 41-75-1(f). On June 27, 2012, Plaintiffs Jackson Women's Health Organization ("JWHO"), Mississippi's sole abortion provider, and Dr. Willie Parker, one of its physicians, filed this lawsuit against the *833 state and local officials tasked with enforcing the Act, seeking to declare both the admitting-privileges and ob-gyn requirements unconstitutional.
Starting with the admitting-privileges requirement, the Court first issued a preliminary injunction [81] blocking the provision because it would likely create an undue burden on women seeking an abortion. The Fifth Circuit affirmed that Order as modified [157], and Plaintiffs asked the Court to convert it to a permanent injunction. Pls.' Mot. [180]. The Court granted that motion on March 17, 2017, ordering: "Defendants are permanently enjoined from any and all forms of enforcement of the admitting privileges requirement of H.B. 1390 against Plaintiffs." Order [190]. Plaintiffs thereafter filed their Motion to Clarify, Modify, or Amend [that] Order to Ensure Declaratory and Statewide Relief [192]. Defendants never responded, and the time to do so has long since expired.
Plaintiffs now turn their attention to the Act's ob-gyn requirement, presenting a facial attack to its constitutionality. Pls.' Mot. [197] (seeking summary judgment). Defendants defend the requirement and ask the Court to exclude some of the testimony offered by Plaintiffs' experts. Defs.' Mot. [199]. These motions were discussed in two telephonic conferences with the Court, during which the parties agreed to convert Plaintiffs' summary-judgment motion into one for a permanent injunction. This allows the Court to weigh the evidence and decide the merits based on the record before it.
II. Analysis
A. Motion to Clarify-Admitting-Privileges Requirement
On February 16, 2017, Plaintiffs moved for partial summary judgment on the admitting-privileges requirement. In that motion, Plaintiffs asked the Court to "permanently enjoin Defendants from enforcing the requirement statewide." Pls.' Mot. [180] at 1. The entirety of Defendants' substantive response was as follows:
Although the State disagrees with the analysis and conclusions of the U.S. Supreme Court's opinion in [ Whole Woman's Health v.] Hellerstedt , [--- U.S. ----, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016),] Defendants cannot identify any meaningful distinction between the Texas admitting privileges law struck down in Hellerstedt and the admitting privileges requirement of H.B. 1390. Defendants further acknowledge that the Hellerstedt opinion is binding on both this Court and the Fifth Circuit unless and until that decision is modified, overturned, or vacated. Whether Hellerstedt will stand the test of time is uncertain, but at this time that opinion is controlling authority. Defendants do not confess, concede, or admit any statements, allegations, assertions, arguments, or representations contained in Plaintiff[s'] motion or memorandum except to the extent explicitly stated herein concerning the admitting privileges requirement only.
In conclusion, Defendants respectfully submit that it is appropriate for the Court to analyze the current evidentiary record in light of Hellerstedt and the Fifth Circuit's prior decision in this case, and enter an order consistent with those rulings.
Defs.' Resp. [189] at 2. So on March 17, 2017, the Court entered an order granting Plaintiffs' motion and permanently enjoining the admitting-privileges requirement of the Act "against Plaintiffs." Order [190]. At the time, the Court did not appreciate that Plaintiffs sought facial invalidation of the admitting-privileges requirement.
*834 Plaintiffs now ask the Court to amend its Order to "include declaratory and statewide relief." Pls.' Mem. [193] at 1. They argue that "because the admitting privileges requirement in H.B. 1390 ... imposes barriers on access to abortion in Mississippi without furthering any valid state interest, the Court should find it unconstitutional on its face and enter declaratory and statewide relief" under Hellerstedt. Id. at 4. Defendants offered no objection, and the motion appears consistent with the facts. Plaintiffs' motion to clarify [192] is granted.
B. Daubert Motion[1]
Before addressing the merits of Plaintiffs' claim as to the ob-gyn requirement, the Court must first consider Defendants' Daubert motion and the admissibility of Plaintiffs' experts' testimony. The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides:
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.
The rule "requires trial courts to ensure that proffered expert testimony is 'not only relevant, but reliable.' " In re Tex. Grand Prairie Hotel Realty, L.L.C. , 710 F.3d 324, 329 (5th Cir. 2013) (quoting Daubert , 509 U.S. at 589, 113 S.Ct. 2786 ). "To determine reliability, the trial court must make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can properly be applied to the facts in issue.' " Id. (quoting Daubert , 509 U.S. at 590-91, 113 S.Ct. 2786 ). But "[m]ost of the safeguards provided for in Daubert are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury." Gibbs v. Gibbs , 210 F.3d 491, 500 (5th Cir. 2000).
1. Dr. Grossman
Defendants say the Court should exclude the following opinions from Dr. Grossman: (1) that the ob-gyn requirement will "likely contribute to negative health outcomes," Grossman 2d Supp. Expert Report [199-5] ¶ 19, and (2) that the ob-gyn requirement restricts access to abortion because it "acts as a limit to new clinics opening up in the state and prevents family medicine physicians from traveling to increase capacity at the existing clinic," id. ¶ 23.
According to Defendants, these opinions are based on insufficient facts and data. In particular, they note that Dr. Grossman extrapolated data collected during a research study in Texas and applied those findings to Mississippi in formulating his opinions. Dr. Grossman also testified that his opinion regarding the impact on potential new clinics was "just based on common sense" and the fact that Mississippi is one of the most restrictive states on access to *835 abortions. Grossman Dep. [199-1] at 130-34.
Working backwards, the Court finds that the opinions regarding potential new clinics that Dr. Grossman based "on common sense" are neither helpful nor the product of sufficient methodology. See, e.g., Tajonera v. Black Elk Energy Offshore Operations, L.L.C. , No. 13-0366, 2016 WL 1178669, at *10 (E.D. La. Mar. 28, 2016) (granting Daubert motion where expert opinion was based on "practical, commonsense having worked in the industry standpoint").
Regarding Dr. Grossman's opinions based on his studies in Texas, there are significant problems with trying to equate what happened in Texas with the facts in Mississippi. Aside from the fact that Texas and Mississippi are two very different places, the Texas regulations Dr. Grossman studied caused approximately half of the state's abortion clinics to close. The ob-gyn requirement in Mississippi did not result in any closures, and in fact, the number of abortions performed each year rose after the law was enacted. Still, this is essentially a bench trial based on the record, so the potential threat of untrustworthy expert opinions is lessened. Gibbs , 210 F.3d at 500. The Court therefore declines to strike the opinions, though they are not persuasive.
2. Dr. Prine
Defendants take issue with Dr. Prine's opinion that the ob-gyn requirement provides no medical benefit to patients because "[w]ith appropriate training, physicians from a range of specialties-including family medicine, [her] specialty-can become competent to provide abortion care." Prine Expert Report [199-7] ¶ 1. Defendants' primary issue with Dr. Prine's opinion is that she "is a family medicine doctor with limited knowledge of the training that [ob-gyns] receive during their residency or the requirements to be board certified as an [ob-gyn.]" Defs.' Mem. [200] at 13. They also fault her testimony as being internally contradictory.
The Court concludes that Defendants' objections to Dr. Prine's testimony go to its weight, not its admissibility. See, e.g., Peteet v. Dow Chem. Co. , 868 F.2d 1428, 1431 (5th Cir. 1989). Dr. Prine's opinion that non-ob-gyn physicians can be trained to competence in abortion care is within the scope of her expertise, experience, and training.
3. Dr. Parker
Finally, Defendants seek to exclude two opinions offered by Dr. Parker: (1) that the ob-gyn requirement provides no benefit to Mississippi women because other physicians can be trained to competently perform abortions, and (2) that the ob-gyn requirement decreases access to abortion care in Mississippi. As to the first opinion, Defendants note a logical gap between the opinion that doctors from other specialties can be trained to competently perform abortions and the conclusion that the ob-gyn requirement therefore confers no benefit. This goes to weight, especially in the context of a bench trial.
Defendants next seek to exclude Dr. Parker's conclusion that the ob-gyn requirement restricts access to abortion care. Defendants say that this opinion is not supported "by sufficient facts or data." Defs.' Mem. [200] at 19. Plaintiffs counter that Dr. Parker's opinion "is appropriately based on his years of experience as an abortion provider at [JWHO] and in the South more broadly, including his conversations with professional colleagues and his experience trying to attract abortion providers to the region." Pls.' Mem. [207] at 17. As with the other opinions, Defendants' argument goes to the weight of Dr. *836 Parker's testimony, which the Court will consider and assess.
C. Motion for Summary Judgment as Converted to Motion for Permanent Injunction-Ob-Gyn Requirement
Plaintiffs ask the Court to declare the ob-gyn requirement facially unconstitutional.[2] In Hellerstedt , the Supreme Court once again visited the analysis applied to legislative restrictions on abortions:
We recognize that the "State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." Roe v. Wade , 410 U.S. 113, 150, 93 S.Ct. 705, 35 L.Ed.2d 147 ... (1973). But, we added, "a statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." [ Planned Parenthood of Se. Pa. v.] Casey , 505 U.S. [833,] 877, 112 S.Ct. 2791, 120 L.Ed.2d 674 [ (1992) ] (plurality opinion). Moreover, "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." Id. at 878, 112 S.Ct. 2791....
Hellerstedt , 136 S.Ct. at 2309.[3]
The Hellerstedt Court reversed the Fifth Circuit, which had concluded "that a state law is 'constitutional if: (1) it does not have the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus; and (2) it is reasonably related to (or designed to further) a legitimate state interest.' " Id. (quoting Whole Woman's Health v. Cole , 790 F.3d 563, 572 (5th Cir. 2015) ). The Court said the Fifth Circuit's formulation of the test "may be read to imply that a district court should not consider the existence or nonexistence of medical benefits when considering whether a regulation of abortion constitutes an undue burden," whereas under Casey , courts must "consider the burdens a law imposes on abortion access together with the benefits th[at] law[ ] confer[s]." Id.
So under Hellerstedt ,
this Court must consider (a) evidence regarding whether and how [a challenged] restriction furthers the legislature's purported interest ... and (b) evidence regarding the actual burdens the restriction places on women seeking abortions. The Court must then assess the burdens and benefits of the restriction, and weigh the former against the latter to ensure that the burden the law imposes is not "undue."
June Med. Servs. LLC v. Kliebert , 250 F.Supp.3d 27, 33 (M.D. La. 2017). The Court will address the benefits of and burdens imposed by the ob-gyn requirement offered by the parties, making factual findings where disputes appear.[4]
*837 1. Benefits
Defendants say the ob-gyn requirement "provides benefit[s to Mississippi women seeking abortions] by ensuring that doctors associated with high-volume abortion clinics ... are specialists in women's reproductive healthcare." Defs.' Mem. [206] at 4. They elaborate that requiring clinic-associated physicians to be board certified or eligible in obstetrics and gynecology
confers benefits on Mississippi women in several ways: by ensuring that they will be treated by a physician who can be presumed to have received the necessary training in reproductive healthcare to perform an abortion or equivalent procedure, by giving them the benefit of knowing that their abortion doctor is a specialist in women's healthcare, who has met or exceeded all of the strenuous requirements for board certification in the most relevant medical specialty, and indicating they are being treated by a physician less likely to be subjected to professional discipline than other physicians.
Id. at 6. Defendants also note that to be a board-eligible or board-certified ob-gyn, a physician must complete a four-year residency in obstetrics and gynecology. Prine Dep. [205-4] at 49. Also, those physicians who attain board certification must undergo continuing certification.
Based on this, Defendants have shown that the ob-gyn requirement provides some benefit to women's health in that it ensures that physicians performing abortions in Mississippi abortion clinics are specialists in women's healthcare who are trained to perform abortions or their equivalents. The Court therefore rejects the opinions of Plaintiffs' experts who testified that the ob-gyn requirement provides no benefit to Mississippi women seeking abortions. E.g. , Prine Decl. [197-7] ¶¶ 7, 22; Parker Decl. [197-1] ¶ 19; Grossman Decl. [197-4] ¶ 6.
But Defendants' argument does not properly frame the issue. First, the question under Hellerstedt is whether "the new law advance[s the state's] legitimate interest in protecting women's health" "compared to prior law. " Hellerstedt , 136 S.Ct. at 2311 (emphasis added). Second, HB 1390 is not limited to board-certified doctors; it also allows board-eligible physicians to perform abortions. Thus, the Court must consider this lesser credential against the pre-existing requirements.
Under prior Mississippi law, all physicians associated with an abortion facility must have either "completed a residency in family medicine, with strong rotation through OB/GYN," "completed a residency in obstetrics and gynecology," or had "at least one year of postgraduate training in a training facility with an approved residency program and an additional year of obstetrics/gynecology residency." Miss. Code R. § 15-16-1:44.1.5(24). By contrast, board eligibility requires graduation in good standing from an ob-gyn residency program, but it does not require the experience necessary to sit for the American Board of Obstetricians and Gynecology oral exam or actually passing that exam. See Parker Decl. [197-1] ¶ 21.
Defendants do not explain how these board-eligibility requirements are "more effective than pre-existing [Mississippi] law" that already required substantial training in obstetrics and gynecology. Hellerstedt , 136 S.Ct. at 2314. In fact, Defendants offer just one argument regarding pre-existing law: "[B]ased on Plaintiffs' arguments and their experts' opinions, the prior requirement would also be constitutionally infirm." Defs.' Mem. [206] at 9 n.3. But the constitutionality of the previous regulations is not *838 before the Court. Plaintiffs offered evidence satisfying their burden on this point, and Defendants have not rebutted it. The Court concludes that the ob-gyn requirement produces no benefit to Mississippi women as compared to prior law.[5]
2. Burdens
But the Court's inquiry does not end there, as it must weigh any burdens the ob-gyn requirement imposes against the benefits to determine whether the ob-gyn requirement constitutes an undue burden. On this issue, Plaintiffs say they prevail because Defendants failed to offer any evidence. The Court disagrees for three reasons. First, Plaintiffs carry the burden of proof, so Defendants are not required to offer evidence if Plaintiffs fall short. Second, the Court is not required to accept any witness's testimony. And in this highly charged context, most witnesses have a vested interest in the outcome. Finally, Defendants rely largely on statistics Plaintiffs do not dispute. Those statistics, coupled with the testimony cited below, constitute competent evidence.
To summarize Plaintiff's burdens argument, they say the ob-gyn requirement "restricts who can provide abortion and thereby limits abortion access in Mississippi, imposing numerous burdens on women." Pls.' Mem. [198] at 20. In particular, they contend that the ob-gyn requirement "shrinks the pool of providers who can perform abortions in the state," thus "limit[ing] the availability of abortion services by reducing the number of days that [JWHO] can provide abortions." Id. at 21. The limited availability of abortions in Mississippi "creates delays for patients seeking this time-sensitive health care." Id. at 22. Delays could lead to a woman "forgo[ing] the abortion that is best for" her or not obtaining a legal abortion at all. Id. at 23-24. Finally, Plaintiffs say, for those Mississippi women for whom the limited availability of an in-state abortion causes them to leave the state to obtain care, the travel and costs associated with that decision constitute additional burdens. Id. at 24.
Certainly, abortion services are limited in Mississippi, but Plaintiffs have not causally linked the burdens they identify to the ob-gyn requirement. Abortion services were limited long before HB 1390, yet since its enactment, the number of abortions performed annually in this state has actually risen. The number of abortions performed at JWHO-essentially the state's sole provider-increased from 2,112 in 2012, when the Act went into effect, to 2,479 in 2015-a 17% increase. And this comes while abortions are in decline nationally. Grossman Dep. [205-3] at 55-56; Abortion Incidence Article [205-11] at 4.
As to the availability of abortions generally, JWHO is open six days a week, providing surgical abortions two days a week and medication abortions three days a week based on the schedules of the doctors currently on staff. JWHO 30(b)(6) Dep. [205-2] at 48-55, 74. "[T]wo to three days per week for performing procedures" has been JWHO's standard since it opened in 2010, "[b]ecause of the doctors' availability." Id. at 50. In other words, the clinic's schedule has remained the same before and after the ob-gyn requirement was enacted in 2012.
*839 Plaintiffs say that, if the ob-gyn requirement were lifted, JWHO would attempt to hire one or more of "a number of family medicine physicians" it has identified, as well as "an ob-gyn who is not board-certified or board-eligible" who previously "provided abortion services at [JWHO.]" Pls.' Mem. [198] at 12. They speculate that if JWHO were able to add some of these physicians, it could perform procedures on more days each week, thus expanding access to abortion in Mississippi. But the last time JWHO increased the number of doctors performing procedures at the clinic-from two to three-the addition of the third doctor did not permit JWHO to "be open more days. It just made [the] schedule more flexible for [the] doctors." JWHO 30(b)(6) Dep. [205-2] at 89-90.
In any event, the Court is not convinced that JWHO cannot hire board-certified or board-celigible ob-gyns. The clinic has consistently found physicians with those credentials in the past and currently employs four board-certified ob-gyns. Brewer Decl. [197-3] ¶¶ 7-8. At this time, most abortions at JWHO are performed by two board-certified ob-gyns, but two other board-certified ob-gyns are on the medical staff and seem to fill in for the others when necessary.
Plaintiffs say it would be easier to hire family-medicine physicians for the clinic. See, e.g., id. ¶ 21. Maybe so, but the question is whether the law creates a burden on women seeking abortions, not the doctors or clinics providing them. See Hellerstedt , 136 S.Ct. at 2309 (citing Casey , 505 U.S. at 877, 878, 112 S.Ct. 2791 ). And here, Defendants say JWHO found board-certified ob-gyns before and could do it again. See Defs.' Mem. [206] at 27. In fact, as many as 75% of all abortions in the United States are performed by ob-gyn specialists. Prine Decl. [197-7] ¶ 6.
Plaintiffs offer no persuasive response to Defendants' argument, and their declarations fail to establish that JWHO is unable to find additional board-eligible or board-certified ob-gyns. As for the family-practice physicians they mention, Plaintiffs do not say who they are or whether they would be eligible under the pre-existing law, which is not before the Court. See Parker Decl. [197-1] ¶¶ 29-30; Carr-Ellis Decl. [197-2] ¶¶ 10-12. Along these same lines, JWHO has not attempted to hire a physician to work full-time to the exclusion of other obligations. JWHO 30(b)(6) Dep. [205-2] at 74. Finally, as to this point, it appears the clinic could perform more abortions with its existing staff. Id. at 67-68.[6]
As for the alleged delay, Plaintiffs contend that the combination of Mississippi's waiting period and the availability of abortion providers means that some women are forced to wait beyond the deadline for obtaining a medication abortion or even a surgical abortion.[7] But Defendants point out that Plaintiffs' evidence on this point is vague and speculative whereas they admit that patients missed these same deadlines before the new requirements. JHWO 30(b)(6) Dep. [205-2] at 82. Plaintiffs have offered nothing in response to meet their *840 burden of showing the alleged delays were causally related to the Act.
Plaintiffs also suggest that the ob-gyn requirement has precluded other abortion clinics from opening in the state and that, as a result, Mississippi women are forced to leave the state to obtain an abortion. This is pure speculation. To begin, there are any number of reasons why Mississippi women might cross the state line to obtain an abortion, including privacy and geographic proximity. Regardless, there is no dispute that JWHO has been the only clinic in the state for over a decade-long before HB 1390. Carr-Ellis Decl. ¶ 14. Also, if Plaintiffs were correct, you would expect the number of out-of-state abortions to increase after the Act's effective date, but the opposite is true; the number of women leaving Mississippi for abortions has actually declined. See Rikelman Decl. [197-9] ¶ 5 & Ex. B [197-13] at MSDH SUPP.002327. Plaintiffs have not shown a causal connection between the Act and the number of clinics.
For these reasons, the Court cannot agree factually that Plaintiffs have established a substantial obstacle to a woman's right to seek an abortion. While they liken this case to Hellerstedt , the facts in Mississippi are nowhere near those in Texas. There, the disputed regulation "led to the closure of half of Texas' [abortion] clinics, or thereabouts," resulting in substantial obstacles. 136 S.Ct. at 2313. Women in Texas-a geographically massive state-were forced to travel far greater distances to obtain abortions, and as Dr. Grossman opined in that case, the remaining clinics would have had to increase their capacity from 14,000 abortions annually to 60,000 to 70,000 to meet the demand. Id. at 2316.
None of that is true here. There was one clinic in Mississippi before HB 1390 and one clinic after. That clinic now performs 17% more abortions than it did before-despite a general decline in abortions nationwide. Patients experienced delays at JWHO before and after the change, and the number of people leaving the state to obtain abortions has actually dropped since enactment. Plaintiffs have not established a burden.
3. Facial Validity
Where to go from here gets trickier, starting with the test for a facial challenge. Historically, the Supreme Court has distinguished between facial and as-applied challenges to laws. "Broad [facial] challenges ... impose a heavy burden upon the parties maintaining the suit.... [But w]hat that burden consists of in the specific context of abortion statutes has been a subject of some question." Gonzales v. Carhart , 550 U.S. 124, 167, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) (citation and quotation marks omitted). In most contexts, courts find "facial invalidation only if no possible application of the challenged law would be constitutional." Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott , 748 F.3d 583, 588 (5th Cir. 2014) (citation omitted). But in the abortion context, Casey suggested that a law would be facially invalid if "it erected an undue burden on women's decisions to choose abortion in a 'large fraction' of cases." Id. (citing Casey , 505 U.S. at 895, 112 S.Ct. 2791 ). The Fifth Circuit has noted this conflict but has applied "the 'large fraction' nomenclature for the sake of argument only, without casting doubt on the general [no-possible-application] rule." Id. at 588-89.
In Hellerstedt , the majority opinion did not discuss the conflict over the applicable standard, but it summarily addressed Texas's argument that the law did not impose a substantial obstacle on a "large fraction" of Texas women. 136 S.Ct. at 2320. According to the Court, the relevant denominator in determining that fraction should have *841 been "those [women] for whom [the provision] is an actual rather than an irrelevant restriction." Id. (citing Casey , 505 U.S. at 895, 112 S.Ct. 2791 ). Given the large number of women facing substantial obstacles under the disputed Texas regulations, the Court held that the law created a substantial obstacle in " 'a large fraction of cases in which [it] is relevant.' " Id. (quoting Casey , 505 U.S. at 895, 112 S.Ct. 2791 ).
From this, Plaintiffs say the Court need not make any calculations regarding the fraction and more generally argue that the "ob-gyn requirement is 'relevant for' women who experience these burdens. " Pls.' Supp. Resp. [213] at 4 (emphasis added). In other words, the denominator and the numerator are the same. This inevitably produces a fraction of " '1,' which is pretty large as fractions go." Hellerstedt , 136 S.Ct. at 2343 n.11 (Alito, J., dissenting). Under this construction, if even one woman has been burdened by a state law, then she represents a "large fraction" and the law is unconstitutional on its face.
The Eighth Circuit is the only circuit to consider this issue after Hellerstedt , and it saw things differently. In Planned Parenthood of Arkansas & Eastern Oklahoma v. Jegley , the court defined the denominator as "women seeking medication abortions in Arkansas" and the numerator as those women who were actually burdened. 864 F.3d 953, 959-60 (8th Cir. 2017), reh'g and reh'g en banc denied (8th Cir. Sept. 17, 2017), petition for cert. filed , No. 17-935 (U.S. Dec. 21, 2017).
Whether Jegley survives appeal remains to be seen, but this Court need not go that far to reject Plaintiffs' construction. By ignoring the difference between relevance and burden, Plaintiffs define the facial-attack test out of existence, nullifying decades-long jurisprudence. Had the Hellerstedt Court wished to make that dramatic departure, it could have simply said there is no longer a distinction between as-applied and facial attacks in the abortion context. But its limited discussion of the issue never says that. In any event, Plaintiffs have not factually shown a burden. If the numerator is zero, there is no fraction regardless of the denominator. Accordingly, Plaintiffs have not demonstrated that the ob-gyn requirement creates a substantial obstacle in "a large fraction of cases in which [it] is relevant." Hellerstedt , 136 S.Ct. at 2320 (quoting Casey , 505 U.S. at 895, 112 S.Ct. 2791 ).[8]
So the Court is left with a challenged law that provides no demonstrated benefit compared to prior law, but which places no substantial obstacles in the path of a large fraction of women to whom it is relevant. Plaintiffs' summary-judgment/permanent-injunction motion is therefore denied.[9]
*842 III. Conclusion
The Court has considered all arguments. Those not specifically addressed would not have changed the outcome. For the foregoing reasons, Plaintiffs' Motion to Clarify [192] is granted, and the Court hereby permanently enjoins, statewide, and declares facially unconstitutional, the admitting-privileges requirement of the Act. Plaintiffs' Motion for Summary Judgment [197], as converted to a Motion for Permanent Injunction, is denied, as is Defendants' Motion to Exclude [199] except as noted herein. The Court will enter a separate judgment in accordance with Federal Rule of Civil Procedure 58.
SO ORDERED AND ADJUDGED this the 15th day of March, 2018.

Daubert v. Merrell Dow Pharm., Inc. , 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Plaintiffs do not mount an as-applied challenge.

Plaintiffs make a passing reference to the "purpose" avenue, noting that some Mississippi politicians have said they hope to ban abortions in Mississippi. But as Defendants note, it is difficult to determine "purpose" in legislative acts like this. See Defs.' Mem. [206] at 10 n.4 (citing Barnhart v. Sigmon Coal Co. , 534 U.S. 438, 457, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) ) (other citations omitted). Plaintiffs offered no rebuttal, so the Court focuses on the "effects" theory.

The parties have presented nearly 800 pages of record evidence. While the Court endeavors to consider the record as a whole, it is under no duty to search the record for evidence when the party has not cited it in its submissions. Cf. RSR Corp. v. Int'l Ins. Co. , 612 F.3d 851, 857 (5th Cir. 2010).

Defendants cite articles discussing the percent of disciplined physicians who are board certified. See Defs.' Mem. [206] at 6. Plaintiffs object to the admissibility of the articles. The Court finds the articles are irrelevant because the Act's ob-gyn requirement would permit board-eligible physicians who are not board-certified ob-gyns to perform abortions at a clinic.

The Court is not suggesting that the clinic should attempt to perform the nearly 50 abortions it apparently provided on its record-high day. Id. at 68. But the clinic averages about 20 per day, and given the small number of delays they allege, even a couple of extra procedure a week might address the alleged burden. By comparison, the clinics in Hellerstedt would have had to perform five times the number of abortions to make up for the clinics that closed. 136 S.Ct. at 2316.

JWHO performs medication abortions up to 10 weeks and surgical abortions up to 16 weeks from a woman's last menstrual period.

Defendants offer an equation that is more in line with Casey , where the law itself applied to a small subsection of the population. If Plaintiffs are correct that the restriction regularly affects JWHO's scheduling, then the women for whom the regulation is relevant would be those seeking abortions at JWHO. That denominator is just shy of 2,500 annually. As for the numerator, JWHO states that each week at least one potential patient "times out" of her ability to obtain an abortion due to scheduling limitations. JWHO 30(b)(6) Dep. [205-2] at 72. Even doubling that number, annualizing it, and dividing it by the denominator yields a quotient of around 4%-not a large fraction. See Cincinnati Women's Servs., Inc. v. Taft , 468 F.3d 361, 374 (6th Cir. 2006) ("[T]he term 'large fraction,' which, in a way, is more conceptual than mathematical, envisions something more than the 12 out of 100 women identified here."). Of course this assumes a causal link between the delays and the law that is still missing.

In candor-and with considerable respect for the high court-it is difficult to apply Hellerstedt to these facts. See Hellerstedt , 136 S.Ct. at 2326 (Thomas, J., dissenting) (observing that opinion "will surely mystify lower courts for years to come"). There is no doubt the majority instructed courts to compare the benefits of a new regulation to its burdens. This Order does that. But the facts in Hellerstedt were so lopsided that the Court was never forced to explain how the test operates at the margins. It did not, for example, say which side must outweigh the other or by how much. As a result, courts have already filled in the gaps in inconsistent ways. Compare Jegley , 864 F.3d at 960 n.9 (construing test as requiring proof that "benefits are substantially outweighed by the burdens it imposes on a large fraction of women seeking abortion in Arkansas" (emphasis added) ), with June , 250 F.Supp.3d at 32 (holding that "a restriction must be shown to actually 'further' its purported interest, and it is constitutional only if its benefits outweigh its burdens" (emphasis added) ). Aside from these differing tests, this Court questions what happens when there are no benefits or burdens. It seems that the Hellerstedt Court would not have delved so deeply into the burdens if the mere lack of benefits renders a law unconstitutional.
Finally, it is also unclear what remains of the holding in Casey that "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." Hellerstedt , 136 S.Ct. at 2309 (citing Casey , 505 U.S. at 878, 112 S.Ct. 2791 (emphasis added) ). This language creates a causation requirement that federalism would seemingly demand before a federal court can strike a state law it finds unnecessary. Moreover, can a law with no burdens constitute a "substantial obstacle"? In the end, the majority opinion in Hellerstedt never overruled Casey. And it was not required to wrestle with the interplay between any of these tests in the way this case presents.