# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-1725

_____

Richard Brakebill; Dorothy Herman; Della Merrick; Elvis Norquay; Ray Norquay; Lucille Vivier, on behalf of themselves,

*Plaintiffs - Appellees*,

v.

Alvin Jaeger, in his official capacity as the North Dakota Secretary of State,

*Defendant - Appellant*.

_____

Appeal from United States District Court
for the District of North Dakota - Bismarck

_____

Submitted: September 10, 2018
Filed: July 31, 2019

_____

Before COLLOTON, BENTON, and KELLY, Circuit Judges.

_____

COLLOTON, Circuit Judge.

This appeal arises from a challenge by six Native American plaintiffs to portions of North Dakota's elections statutes. North Dakota requires a voter to present a specific form of identification at the polls before receiving a ballot. That identification must provide, among other things, the voter's current residential street address. If a voter's identification is missing the required information, or if the

information provided is not current, a voter may supplement with certain documents. Six plaintiffs sued the North Dakota Secretary of State, alleging that the provisions place an unconstitutional burden on the right to vote of many Native Americans. The district court agreed and enjoined the Secretary from enforcing certain statutory requirements statewide. The Secretary appealed. We conclude that the alleged burdens do not justify a statewide injunction, and we therefore vacate the district court's order.

I.

A.

North Dakota has no voter registration requirement, so a resident may appear at the polls on election day and cast a ballot without any previous expression of desire to vote. Election officials at the polls are charged with determining whether a person who appears is qualified to vote. Before 2013, voters could establish their qualifications by using certain forms of identification. If a voter could not present proper identification, the voter was nonetheless permitted to cast a ballot after swearing an affidavit or upon vouching by a poll worker. In 2013, the North Dakota legislature enacted HB 1332. That law limited the types of acceptable identification and eliminated the affidavit and vouching options. The legislature further limited the list of acceptable forms of identification in 2015.

The six appellees in this case originally filed suit in January 2016. Each plaintiff-appellee is a member of the Turtle Mountain Band of Chippewa Indians and a resident of North Dakota. The plaintiffs alleged that the voter identification requirements violated the Constitution of the United States and the North Dakota Constitution, as well as Section 2 of the Voting Rights Act. On August 1, 2016, the district court granted the plaintiffs' motion for a preliminary injunction. Citing

statistical evidence, the court determined that the identification requirements imposed "'excessively burdensome requirements' on Native American voters in North Dakota" that outweighed the State's asserted interests. The court concluded that the plaintiffs were likely to succeed on the merits of their federal constitutional claim and did not consider state law or the Voting Rights Act. The court enjoined the Secretary from enforcing the identification requirements statewide and required the Secretary to offer an affidavit alternative when a voter lacked proper identification. The Secretary did not appeal.

The North Dakota legislature then modified the State's voting requirements once more. Effective August 1, 2017, the current provision requires qualified voters to provide "a valid form of identification" before receiving a ballot. N.D. Cent. Code Ann. § 16.1-01-04.1(1). The statute defines a "valid form of identification" as a driver's license or nondriver's identification card issued by the North Dakota department of transportation, *id.* § 16.1-01-04.1(3)(a)(1), or "[a]n official form of identification issued by a tribal government to a tribal member residing in this state." *Id.* § 16.1-01-04.1(3)(a)(2).

For a voter to receive a ballot, the valid form of identification must provide the voter's (1) legal name, (2) current residential street address in North Dakota, and (3) date of birth. *Id.* § 16.1-01-04.1(2). If a voter's identification lacks any of those three items, the voter may still cast a ballot if she can provide the missing information using one of several supplemental documents: a current utility bill, a current bank statement, a check issued by a federal, state, or local government, a paycheck, or a document issued by a federal, state, or local government. *Id.* § 16.1-01-04.1(3)(b).

A prospective voter who cannot provide a valid form of identification at the polls may mark a ballot that is set aside. *Id.* § 16.1-01-04.1(5). The voter then may present a valid form of identification to an official at the polling place before the polls

close, or present such identification within six days to "an employee of the office of the election official responsible for the administration of the election." *Id.*

## B.

In December 2017, the plaintiffs filed an amended complaint challenging the current provisions. The Secretary moved to dissolve the August 2016 injunction in light of the intervening change in law; the plaintiffs moved for a second preliminary injunction. The district court granted both motions, dissolving the August 2016 injunction as "moot" and enjoining the Secretary from enforcing parts of the current North Dakota provisions.

The district court enjoined the Secretary from enforcing three statutory requirements. First, the court forbade the Secretary to enforce the requirement of § 16.1-01-04.1(2)(b) that a voter produce identification or a supplemental document with a "[c]urrent residential street address." The court ordered the Secretary also to accept "another form of identification that includes either a 'current residential street address' or a current mailing address (P.O. Box or other address) in North Dakota."

Second, the district court ordered the Secretary to accept as a valid form of identification under § 16.1-01-04.1(3)(a)(2) "an official form of identification issued by a tribal government; the Bureau of Indian Affairs (BIA), any other tribal agency or entity, or any other document, letter, writing, enrollment card, or other form of tribal identification issued by a tribal authority," so long as it sets forth the voter's name, date of birth, and current residential street address or mailing address. The court noted that the Secretary already had interpreted the provision to allow these other forms of identification.

Third, the district court ordered the Secretary to accept as valid supplemental documents under § 16.1-01-04.1(3)(b)(5) "any documents issued by a tribal government, the Bureau of Indian Affairs (BIA), other tribal agencies or authorities, or any other document, letter, writing, enrollment card, or other forms of tribal identification which provide the missing or outdated information." The court said that the Secretary was already accepting these documents too.

In support of the residential street address portion of the injunction, the district court said the Secretary had acknowledged that Native American communities often lack residential street addresses. And, the court explained, "under current State law an individual who does not have a 'current residential street address' will never be qualified to vote." The court thus thought the residential street address requirement was a "clear 'legal obstacle' inhibiting the opportunity to vote."

The district court relied on statistical evidence to support the portions of the injunction expanding the acceptable valid forms of identification and supplemental documents. The court found that 4,998 otherwise eligible Native Americans (and 64,618 non-Native voters) did not possess a qualifying identification. The court cited evidence that 65.6% of those Native Americans also were missing at least one of the underlying documents needed to obtain a valid identification from the State. And the Court found that 48.7% of Native Americans who lack a qualifying identification also lacked "the supplemental documentation needed," such that 2,305 Native Americans would not be able to vote in 2018 under the North Dakota statute.

The Secretary appealed, arguing that the plaintiffs lack standing to challenge the residential street address requirement, that the other two portions of the district court's injunction were unnecessary, and that the statewide injunction was improper because the plaintiffs had not established that the statute was invalid on its face. We granted the Secretary's motion for a stay of the residential street address portion of

the district court's order pending appeal. *Brakebill v. Jaeger*, 905 F.3d 553, 561 (8th Cir. 2018).

We now consider the merits of the appeal. In reviewing the issuance of a preliminary injunction, we consider the threat of irreparable harm to the movant, the likelihood that the movant will succeed on the merits, the balance between the harm to the movant and injury that an injunction would inflict on other parties, and the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). A party challenging a state statute must show that he is "likely to prevail on the merits" before the court need weigh other factors. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). The ultimate decision to grant an injunction is reviewed for abuse of discretion, with factual findings examined for clear error and legal conclusions considered *de novo*. *Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, 903 F.3d 750, 754 (8th Cir. 2018). The dispute here turns on the district court's legal conclusions.

II.

The Secretary's first contention is that none of the six plaintiffs has Article III standing to challenge the statute's requirement that a voter provide a current residential street address. The plaintiffs, as the parties invoking federal jurisdiction, bear the burden of establishing standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 561 (1992). The Secretary posits that because each of the six plaintiffs has a residential street address, the statute has not caused any of them to suffer an injury in fact. The district court thought the Secretary had "raised some legitimate concerns," but concluded that "[t]he burden of having to obtain and produce an ID itself has been found sufficient to confer standing, regardless of whether the Plaintiffs are able to obtain an ID." *See Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009). The court reasoned that all of the plaintiffs were injured in fact by "the

requirement to maintain a 'current residential street address,' and thus an interest in real property, and the burden to maintain an ID or supplemental documents to prove he or she has a 'current residential street address.'" The Secretary counters that nothing prevents these plaintiffs from voting either with the tribal identifications they already possess or with new tribal identifications listing their current residential street addresses.

We conclude that at least one of the plaintiffs has standing to raise a facial challenge to the statute. It is true that all six plaintiffs have residential street addresses, but the statute at issue does not merely require a citizen to maintain a residential street address. The statute requires a voter to present a valid form of identification or a supplemental document that "provide[s]" a current residential street address. N.D. Cent. Code Ann. § 16.1-01-04.1(2). Even where a person has a residential street address, the burden of obtaining a qualifying identification or supplemental document is sufficient to constitute an injury that gives a citizen standing to sue. *Common Cause/Ga.*, 554 F.3d at 1351.

In this case, plaintiff Elvis Norquay presented evidence that when the amended complaint was filed, he lived at a homeless apartment complex in Dunseith, but that his tribal identification listed a "prior" address in Belcourt. To vote in the precinct where he currently resides, therefore, Norquay must either obtain a new form of identification with his current residential street address or a supplemental document that includes his current address. The Secretary contends that Norquay can vote either in his current precinct by making a copy of his utility bill, or in his former precinct by mail. Neither option, the Secretary argues, would place a severe burden on Norquay's right to vote. But the severity of the burden is a question relating to the merits, not to Norquay's standing to bring this action. Norquay is injured by the residential street address requirement because he must secure a new form of identification or a supplemental document, and obtaining either would require

Norquay to expend time and resources. That burden is sufficient to give him standing to challenge the residential street address requirement and the two other disputed provisions. The option for Norquay to mail a ballot to a precinct where he lived at an earlier date does not eliminate injury, because Norquay is harmed by an inability to vote for representation in the precinct where he currently resides.

III.

On the merits, the Secretary argues that the district court's statewide injunction was improper because the plaintiffs have not mounted a successful facial challenge to any part of the statute. The Secretary also contends that the court's order expanding acceptable valid forms of identification and supplemental documents was unnecessary, because the Secretary was already interpreting the statute to permit those other forms of identification and documents. The plaintiffs respond that the residential street address requirement is unconstitutional on its face, and that statewide relief was appropriate in any event on their as-applied claims. We consider the three challenged portions of the statute in turn.

A.

We conclude first that the plaintiffs' facial challenge to the residential street address requirement likely fails, and that the statewide injunction as to that provision cannot be justified as a form of as-applied relief. Facial challenges are disfavored, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-51 (2008), and a plaintiff seeking relief that would invalidate an election provision in all of its applications bears "a heavy burden of persuasion." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 200 (2008) (opinion of Stevens, J.).

The plaintiffs argue that the call for a residential street address is "invidious on its face," because it dictates that every voter must have "an interest in property." But the statute does not require a voter to present identification that shows an interest in property. A voter may reside at a street address without having an interest in the property where he resides: Elvis Norquay himself resides at a homeless shelter with a street address. And young adults living with parents and elderly parents living with children need not have an interest in property. All that is required is that a voter show where he or she resides. The residential street address requirement furthers North Dakota's legitimate interest in preventing voter fraud and safeguarding voter confidence, so unlike a poll tax, it is not invidiously "unrelated to voter qualifications." *See id*. at 189 (opinion of Stevens, J.).[1]

The plaintiffs next contend that the district court's statewide injunction was appropriate because the residential street address requirement places severe burdens on some Native Americans' right to vote. The district court thought the requirement posed an impermissible legal obstacle because Native American communities often

---

[1]The dissent, relying on a North Dakota department of transportation website, asserts that a prospective voter must present one of five enumerated documents bearing her name to prove residence when obtaining a state identification card. *Post*, at 17, 28-29. The webpage governing "ID Card Requirements," however, allows a person to prove a resident address by furnishing one of nine different documents, including a bank statement, credit card statement, pay stub, or school transcript/report card. N.D. Dep't of Transp., *Acceptable Proof of Residential Address*, http://www.dot.nd.gov/divisions/ driverslicense/docs/proof-of- address-documents.pdf (last visited July 26, 2019); N.D. Dep't of Transp., *ID Card Requirements*, https://www.dot.nd.gov/divisions/ driverslicense/idrequirements.htm (last visited July 26, 2019). The governing statute requires only that a person provide "satisfactory evidence" of legal presence, and provides that the director of the department may require "proof of residence address," without limiting methods of proof. N.D. Cent. Code Ann. § 39-06-03.1(3). The dissent's list, therefore, does not establish that a voter must have an interest in real property.

lack residential street addresses. The Secretary disputes whether street addresses are truly lacking in these communities, and complains the district court mistakenly relied on outdated evidence about two counties that had not finished assigning addresses as of 2011. But even assuming that a plaintiff can show that an election statute imposes "excessively burdensome requirements" on *some* voters, *id.* at 202 (internal quotation marks omitted), that showing does not justify broad relief that invalidates the requirements on a statewide basis as applied to *all* voters. *See Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016). *Crawford* does not create an exception to the general rule governing facial challenges: a statute's allegedly unconstitutional application in "some conceivable set of circumstances is insufficient to render it wholly invalid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). As the lead opinion explained, "even assuming an unjustified burden on some voters," the "proper remedy" would not be "to invalidate the entire statute." *Crawford*, 553 U.S. at 203 (opinion of Stevens, J.); *see also id.* at 199-200.

Here, the plaintiffs have not presented evidence that the residential street address requirement imposes a substantial burden on most North Dakota voters. Even assuming that some communities do not have residential street addresses, that fact does not justify a statewide injunction that prevents the Secretary from requiring a form of identification with a residential street address from the vast majority of residents who have them.

B.

We also conclude that the statute's requirement to present an enumerated form of identification does not impose a burden on voters that justifies a statewide injunction to accept additional forms of identification. The district court found that 4,998 otherwise eligible Native Americans and 64,618 non-Native voters lacked a qualifying identification. The court also found that 65.6% of the Native American

group were missing at least one of the underlying documents needed to obtain a valid identification from the State. These data, however, leave 513,742 of 583,358 eligible voters in the State, or 88 percent, as to whom the plaintiffs have not shown a lack of qualifying identification. And for the relatively small percentage of eligible voters who lack both a qualifying identification and certain underlying documents, the findings (and the dissent) do not address how many voters attempted to acquire them but were unable to do so with reasonable effort. That is the relevant question for assessing whether a voter is substantially burdened. *See id.* at 198-99; *Frank v. Walker*, 768 F.3d 744, 746-48 (7th Cir. 2014). In short, the evidence is insufficient to show that the valid form of identification requirement places a substantial burden on most North Dakota voters.

The plaintiffs contend that even if only a small percentage of voters are burdened by the identification requirement, the statewide injunction must be upheld because the district court found North Dakota charges eight dollars for nondriver's identification cards. *See Crawford*, 553 U.S. at 198 (opinion of Stevens, J.); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966). The district court relied on the testimony of one witness who said that she was charged a fee to obtain a nondriver's identification card after the 2014 election, on a fee notice on the North Dakota department of transportation website, and on the general statutory fee provision governing operators' licenses. *See* N.D. Cent. Code Ann. § 39-06-49(2)(a). The general fee statute, however, is governed by a more specific provision that since August 1, 2013, has prohibited the director from charging fees to eligible applicants for nondriver identification cards. *See id.* § 39-06-03.1(4). And the current website shows—consistent with the statute—that a nondriver's identification card is available without payment of a fee. N.D. Dep't of Transp., *ID Card Requirements*, https://www.dot.nd.gov/divisions/driverslicense/idrequirements.htm (last visited July 26, 2019). So even if the State charged a fee for nondriver's identification cards at one point, the statutes did not authorize the fee, and the practice is no longer

sanctioned by the department of transportation website. That the State mistakenly collected a fee from one plaintiff in the past does not justify a statewide injunction of the provision governing valid forms of identification.

The statutory requirement that a voter present a valid form of identification does not substantially burden most North Dakota voters and is not invidious on its face. Therefore, an injunction that forbids the Secretary from enforcing the requirement statewide is not warranted. It is unnecessary at this juncture to address whether an identification issued by the Bureau of Indian Affairs is a "valid form of identification" under the terms of the statute.

C.

We likewise conclude that the record is insufficient to justify enjoining the Secretary from enforcing the supplemental documents provision statewide. The district court found that 48.7% of Native Americans who lack a qualifying identification also lack adequate supplemental documents, such that 2,305 Native Americans would not be able to vote in 2018 under the North Dakota statute. But again, these findings do not detail how many voters attempted to obtain a supplemental document and were unsuccessful. Even assuming all 2,305 persons were unable to obtain a supplemental document without a substantial burden, moreover, they represent less than 0.5% of all eligible voters in the State. The findings thus do not establish that the statute places a substantial burden on most North Dakota voters, and a statewide injunction against the supplemental document requirement is unwarranted. It is unnecessary at this time to address whether a supplemental document issued by a tribal government is an acceptable document under the terms of the statute.

IV.

The Secretary also appeals a portion of the district court order stating that the Secretary "shall provide clarification as to the meaning of N.D.C.C. § 16.1-01-04.1(5)." The plaintiffs did not seek this relief, and they do not defend this aspect of the injunction on appeal.

The provision in question establishes that a voter who is unable to show a valid form of identification at the polls may mark a ballot and ensure that it is counted by showing a valid form of identification within six days after the election. If the voter cannot return to the polling place with identification before the polls close, then she may show a valid form of identification "to an employee of the office of the election official responsible for the administration of the election before the meeting of the canvassing board occurring on the sixth day after the election." N.D. Cent. Code Ann. § 16.1-01-04.1(5). The district court ruled that the Secretary must clarify the quoted statutory language.

To support its clarification mandate, the district court concluded that "[n]o reasonable person who reads this statute would have a clue as to where and to whom they need to report to present a valid ID," and that "[c]ommon sense requires more." The district court, however, cited no evidence of voter confusion over this provision, and common sense suggests why there might be no problem. Any voter seeking to identify the "election official responsible" for administering the election may inquire of election officials at the polls. Given that state law requires training of election officials before each election, *see id.* § 16.1-05-03, a voter's inquiry eventually should lead to the "election official responsible" for administering the election. The North Dakota Code and the website of the Secretary of State, moreover, show that county auditors typically are the officials responsible for administering elections. *See id.* § 16.1-01-01(4); N.D. Sec'y of State, *County Election Officials*, https://vip.sos.nd.gov

-13-

/CountyAuditors.aspx?ptlhPKID=34&ptlPKID=5 ("County election officials, who are primarily County Auditors, are responsible to the Secretary of State for administering state election laws, rules, and regulations.") (last visited July 26, 2019). Without evidence that any voter is unable to identify the appropriate election official to whom identification should be submitted after an election, we are not convinced that there is a sufficient basis to enjoin the Secretary to offer formal clarification of the statute. As a matter of good government and public service, of course, the Secretary may publicize the identity of responsible officials on its website or at the polls.

\*　　\*　　\*

Although we conclude that the district court's statewide injunction was not warranted, *Crawford* left open the possibility that a court might have authority to enter a narrower injunction to relieve certain voters of an unjustified burden. *Compare Crawford*, 553 U.S. at 199-200 (opinion of Stevens, J.), *with id.* at 204-05 (Scalia, J., concurring in the judgment). *See Frank*, 819 F.3d at 386-87. The district court in this case enjoined entirely the statutory requirements concerning a residential street address, valid form of identification, and supplemental documents. If the court had rejected the request for statewide injunctive relief and required the plaintiffs to proceed with as-applied challenges based on their individual circumstances, then there may well have been time before the most recent election to consider whether narrower relief was justified. That option remains available going forward. We express no view on the merits of any such challenge, and we do not address in the first instance the claims brought in this case under state law and the Voting Rights Act. The district court's order of April 3, 2018, granting a preliminary injunction is vacated, and the case is remanded for further proceedings.

KELLY, Circuit Judge, dissenting.

A state law that burdens the right of a discrete class of voters to access the ballot violates the Equal Protection Clause unless relevant and legitimate state interests sufficiently justify the burden. In a thorough opinion premised on largely uncontested facts, the district court determined that North Dakota likely violated the Constitution by passing a law requiring all prospective voters to present a form of identification that is both difficult and costly to obtain. The unrebutted evidence demonstrates that the new law will have a particularly devastating effect on eligible Native American voters, thousands of whom will effectively lose the right to vote. North Dakota has proffered no evidence to justify the law's imposition. The district court's conclusion that the law likely runs afoul of the Equal Protection Clause was eminently reasonable and not an abuse of discretion. I would therefore affirm the district court's order granting a preliminary injunction.

I

A

This case began in January 2016 when seven Native American voters sued to enjoin two North Dakota voter-identification laws. The first, H.B. 1332, required prospective voters to show identification bearing "the individual's residential address and date of birth" before obtaining a ballot. See 2013 N.D. Laws ch. 167, sec. 5 (amending N.D. Cent. Code § 16.1-05-07). The law also eliminated the previously existing "fail-safe option," which allowed individuals without proper identification to vote after signing a sworn affidavit attesting to their credentials. See id. sec. 5, 8. The second law, H.B. 1333, restricted the types of acceptable identification. Previously, any form of identification issued by the state or a tribal government was permitted. With two narrow exceptions not relevant here, after H.B. 1333, the only

-15-

forms of identification that could be used to vote were a "current driver's license or nondriver identification card issued by the department of transportation" or an "official form of identification issued by a tribal government." 2015 N.D. Laws ch. 157, sec. 2 (amending N.D. Cent. Code § 16.1-05-07).

Plaintiffs alleged that the new laws unduly burdened the rights of all voters in North Dakota and imposed particularly disproportionate burdens on Native Americans. They sought relief under Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301; the Equal Protection Clause, U.S. Const. amend. XIV; and various provisions of the North Dakota Constitution. In support of their motion for a preliminary injunction, plaintiffs submitted lay and expert evidence, none of which the Secretary refuted or challenged. The unrebutted statistical evidence demonstrated that 23.5% of Native Americans lack a valid form of identification, compared to only 12% of non-Native Americans. The district court concluded that the uncontested evidence established that the two laws likely imposed excessive and disproportionate burdens on Native Americans in violation of the Equal Protection Clause. Brakebill v. Jaeger (Brakebill I), No. 1:16-CV-008, 2016 WL 7118548, at *4, *10 (D.N.D. Aug. 1, 2016).

The district court's lengthy opinion identified many distinct obstacles that make it more difficult for Native Americans to obtain acceptable identification. One is cost. Acquiring identification costs money: replacing a lost or stolen nondriver's identification card costs eight dollars and obtaining a driver's license costs fifteen to twenty-five dollars. Id. at *6–7. Approximately half of Native Americans who lack an acceptable form of identification also lack the underlying documents necessary to obtain it, id. at *4, and obtaining those documents also entails an expense. For example, obtaining a birth certificate costs at least seven dollars. Id. at *5. A passport costs more than one hundred dollars. Id. Because Native Americans in

North Dakota "disproportionally live in severe poverty," id. at *8, these financial burdens potentially prohibit them from voting.

Even if the direct cost of acquiring identification was not prohibitive, Native Americans are far less likely to have access to any motor vehicle and, on average, must travel twice as far as non-Native Americans to visit a Driver's License Site (the only place to obtain qualifying state-issued identification). Id. at *4. There are no Driver's License Sites on any of the reservations in North Dakota. Id. at *6. Twenty-three of the state's twenty-seven Driver's License Sites are open fewer than five days a week. Id. Many are open only for a few hours one day a month. Id. The lack of easy access to these locations presents a disproportionate burden for Native Americans, who are more likely to have difficulty traveling and taking time off work than non-Native Americans. Id.

H.B. 1332's requirement that any identification bear the individual's residential address creates several independent obstacles. For someone who is homeless, the residential-address requirement is an insurmountable barrier. It is also a particular problem for Native Americans. Many tribal-issued identification cards do not list a residential address simply because homes on reservations often do not have one. Id. at *5. Obtaining a state-issued driver's license or nondriver's identification card requires at least two documents reflecting the individual's residential address. See Identification Requirements, N.D. Dep't of Transp., at 3, https://www.dot.nd.gov/divisions/driverslicense/docs/proof-of-identification-documents.pdf (last updated Jan. 11, 2017). The unrebutted evidence shows that 21.6% of Native Americans do not have two qualifying documents bearing their residential address. Brakebill I, 2016 WL 7118548, at *5. Even those who obtain a state-issued identification card face the burden of updating their address when they move, which requires either access to the internet or the ability to travel in person to a Driver's License Site. Fewer than half of Native

-17-

Americans in North Dakota have internet access, a problem that is particularly acute in rural areas and on reservations.  Id. at *7.

Importantly, all of this evidence was uncontested.  In response to plaintiffs' motion, the Secretary proffered no evidence whatsoever.  Id. at *4.  The Secretary merely argued that the laws were not more restrictive for Native Americans than for anyone else, a contention that the district court found "clearly belie[d]" by the record.  Id. at *9.  In short, the evidence established unequivocally that the laws imposed "substantial and disproportionate burdens" on Native Americans.  Id. at *5.

The district court then summarized the interest of the state in enforcing the two laws.  It recognized that the state has a legitimate interest in safeguarding the integrity of its elections from voter fraud, but it found that this justification for the laws was "far outweigh[ed]" by the burden imposed by the laws on Native American voters.  Id. at *10.  In particular, H.B. 1332's elimination of the "fail-safe option" completely disenfranchised those "voters who simply cannot obtain a qualifying [identification] with reasonable effort."  Id.  The district court noted that North Dakota appeared to be the only state without any sort of fail-safe provision in its election laws.  Id. at *13.  The court estimated that, absent injunctive relief, more than 3,800 Native Americans would likely be denied the right to vote in the upcoming November 2016 general election.  Id. at *11.  After balancing the respective harms and the public interest, the district court concluded that plaintiffs had met their burden of establishing the necessity of a preliminary injunction.  It enjoined the Secretary from enforcing the laws without a fail-safe option such as the previous provision permitting voters to sign an affidavit if they lacked a qualifying form of identification.

The Secretary chose not to appeal the district court's order, and the injunction remained in place for the 2016 general election.

-18-

B

In April 2017, North Dakota passed a new law, H.B. 1369, which went into effect on July 1, 2017. See 2017 N.D. Laws ch. 152. Like its predecessors, H.B. 1369 generally allows poll workers to accept only two forms of voter identification: (1) a North Dakota driver's license or nondriver's identification card; or (2) "[a]n official form of identification issued by a tribal government to a tribal member residing in this state." Id. sec. 2 (codified at N.D. Cent. Code § 16.1-01-04.1(3)(a)). But H.B. 1369 makes several important changes to North Dakota's election laws, two of which are of particular relevance to this appeal.

First, unlike H.B. 1332, which required the voter's identification to include "the individual's residential address," H.B. 1369 requires the identification to contain the individual's "[c]urrent residential street address in North Dakota." Id. (codified at N.D. Cent. Code § 16.1-01-04.1(2)). This has been referred to as the "current RSA requirement." If the identification is missing the voter's current RSA, legal name, or date of birth, the voter may supplement the missing or outdated information with one of five documents: (1) a current utility bill; (2) a current bank statement; (3) a check issued by a federal, state, or local government; (4) a paycheck; or (5) a document issued by a federal, state, or local government. Id. (codified at N.D. Cent. Code § 16.1-01-04.1(3)(b)).

Second, H.B. 1369 replaces the fail-safe option with a new provisional ballot system (sometimes called a set-aside ballot system). See id. (codified at N.D. Cent. Code § 16.1-01-04.1(5)). It provides that an individual who is unable to present a valid identification on election day may be allowed to mark a provisional ballot that will be set aside. For the ballot to be counted, the individual must "show a valid form of identification to either a polling place election board member if the individual returns to the polling place before the polls close, or to an employee of the office of

-19-

the election official responsible for the administration of the election before the meeting of the canvassing board occurring on the sixth day after the election." Id. (codified at N.D. Cent. Code § 16.1-01-04.1(5)). The law does not indicate who "the election official responsible for the administration of the election" is. Instead, it directs the Secretary to develop "uniform procedures" for implementing this provision. Id. (codified at N.D. Cent. Code § 16.1-01-04.1(6)).

In response to H.B. 1369, six of the original plaintiffs moved to amend their complaint, and one withdrew from the case. The Secretary then moved to dissolve the district court's previous injunction. Plaintiffs moved for a new preliminary injunction on the same grounds as the original injunction request. They also supplemented their request with updated evidence. As with the first injunction motion, the Secretary did not contest any of plaintiffs' evidence, and the district court concluded that the uncontested evidence established that the new law likely violated the Equal Protection Clause. See Brakebill v. Jaeger (Brakebill II), No. 1:16-CV-008, 2018 WL 1612190, at *2, *7 (D.N.D. Apr. 3, 2018).

In addition to incorporating its prior discussion of the evidence submitted in connection with the first preliminary injunction, the district court recounted the updated statistical evidence: 19% of Native American eligible voters still lack one of the two forms of qualifying identification allowed under H.B. 1369, compared to only 11.6% of non-Native Americans. Id. at *2. Of those Native Americans without a valid identification, 65.6% lack the underlying documents they would need to obtain one. Id. And among those who would have a valid form of identification but for the current RSA requirement, 48.7% do not possess at least one of the supplemental documents accepted under H.B. 1369, compared to only 26.2% of non-Native American voters. Id. at *3.

-20-

The district court noted that the current RSA requirement is a particularly harsh burden for those living on tribal reservations because, as the Secretary acknowledged, "Native American communities often lack residential street addresses," and many residents use only their mailing address, which is often a P.O. Box. Id. at *4. An individual without a current RSA—or, more accurately, without adequate proof of one—"will never be qualified to vote" under H.B. 1369. Id. Thus, the law "completely disenfranchises anyone who does not have a 'current residential street address[,]' . . . includ[ing] homeless persons as well as many persons living on Native American reservations." Id. at *6.

The district court concluded that several of the Secretary's arguments about the availability of identification cards were not supported by the evidence. Specifically, it found that the Secretary's claim that non-driver's identification cards are available for free was directly contradicted by the North Dakota Department of Transportation's website, which at the time clearly stated that the cards cost eight dollars, and by the testimony of at least one plaintiff who was charged such a fee. Id. at *6; see Brakebill v. Jaeger (Brakebill III), 905 F.3d 553, 562 & n.5 (8th Cir. 2018) (Kelly, J., dissenting). And it found that the Secretary's claim that poll workers would accept any identification issued by the Bureau of Indian Affairs (BIA) appeared to conflict with the plain text of H.B. 1369, which requires identification to be issued by a "tribal government" and makes no mention of the BIA, a federal agency. Brakebill II, 2018 WL 1612190, at *6. As for the Secretary's claim that poll workers would accept as a supplemental document any document, even a letter, from "tribal authorities" that contained the voter's name, date of birth, and current RSA, the district court expressed skepticism that most poll workers would recognize a letter as an "official form of identification issued by a tribal government." Id. at *5. The state had consistently interpreted this language—identical to that used in H.B. 1333—as requiring an official tribal identification card, not a letter. The Secretary produced no "official state administrative rule, regulation, policy, procedure,

memorandum, or any other document or public pronouncement espousing" this "new-found interpretation of the law." Id. at *5.

The court also criticized H.B. 1369's new provisional ballot system, which was intended to replace the fail-safe provision reinstated by the prior injunction. It noted that the provisional ballot system will not help any voter who is unable to obtain qualifying identification. Id. at *4–5. Those living on reservations without clear residential street addresses, for example, would never be able to have their votes counted under this procedure. Even voters with the means to obtain a driver's license or nondriver's identification card are unlikely to be able to visit a Driver's License Site, acquire the required identification, and return to the relevant election official within the six days following an election in order to have their ballot counted. And, the district court noted, the law "is vague and unclear as to where and to whom such a voter is to produce" his identification or supplemental documents, exacerbating the problems created by the rest of the law. Id. at *4.

Overall, the district court explained, at least 4,998 otherwise eligible Native American voters lack a valid identification under H.B. 1369. Id. at *4. Approximately 48.7% of those individuals also lack adequate supplemental identification documents, meaning that at least 2,305 eligible Native American voters cannot vote under the new law. Id.

Finally, the district court addressed the evidence of potential voter fraud in North Dakota. In short, there is none. The Secretary produced "no evidence of voter fraud in the past, and no evidence of voter fraud in 2016," when the first injunction remained in place. Id. at *6. At most, this left only "the theoretical possibility of voter fraud [that] exists with every election nationwide." Id.

After weighing the competing interests at stake, the district court dissolved its prior injunction as moot and granted plaintiffs' request for a new preliminary injunction. The new injunction prevented the Secretary from enforcing only a few discrete subsections of H.B. 1369. First, the district court enjoined the current RSA requirement and ordered the Secretary to accept identification bearing a current RSA or a current mailing address, thereby accommodating the many Native American voters who lack identification bearing a current RSA. Second, consistent with the Secretary's litigation positions, the court required the Secretary to accept two additional forms of identification and supplemental documentation: (1) tribal identification cards issued by the BIA and (2) letters issued by tribal authorities. Finally, the district court instructed the Secretary to promulgate guidance on how voters could comply with the new provisional ballot system. H.B. 1369 already requires the Secretary to "develop uniform procedures" for implementing the system, 2017 N.D. Laws ch. 152, sec. 2 (codified at N.D. Cent. Code § 16.1-01-04.1(6)), so this aspect of the injunction simply amounted to requiring the Secretary to comply with the law as written. The district court did not reinstate the affidavit fail-safe option.

The Secretary appealed. He argues that plaintiffs lack standing to challenge the current RSA requirement because they all possess current RSAs. He also argues that the injunction permitting the use of identification bearing a mailing address will allow nonresidents to vote and will allow residents to vote in the wrong precincts. And he argues that plaintiffs, as members of the Turtle Mountain Band of Chippewa, cannot obtain an injunction requiring acceptance of BIA-issued identification cards because the BIA only issues cards to members of the Standing Rock Sioux tribe. Finally, he argues that the district court improperly ordered him to comply with his statutory duty to develop uniform procedures for the provisional ballot system. This court initially declined to stay enforcement of the preliminary injunction pending the appeal, Brakebill v. Jaeger, No. 18-1725, slip op. at 1 (8th Cir. June 8, 2018), but then

-23-

reversed course shortly before the November 2018 election and stayed the portions of the injunction requiring the Secretary to accept identification and supplemental documents bearing a current mailing address, Brakebill III, 905 F.3d at 561. The Supreme Court declined to vacate our stay, over the objection of two Justices. See Brakebill v. Jaeger, 139 S. Ct. 10 (2018) (Ginsburg, J., dissenting).

II

As a threshold matter, the Secretary asserts that plaintiffs lack standing to challenge the current RSA requirement because they all possess residential street addresses. This argument misses the mark. The law does not just require voters to maintain a residence but to obtain and present a qualifying form of identification (or a qualifying supplemental document) reflecting that residence's address. This burden constitutes an injury-in-fact sufficient to confer Article III standing, regardless of whether the citizen has a residential street address or an identification reflecting it. Common Cause/Ga., 554 F.3d at 1352; see Brakebill III, 905 F.3d at 561 (Kelly, J., dissenting). A plaintiff need not be completely disenfranchised to challenge a statute that makes voting more difficult.

III

In assessing the merits of the Secretary's appeal, the best place to begin is with the standard of review. It is well settled that a district court has "broad discretion when ruling on a request for preliminary injunction, and it will be reversed only for clearly erroneous factual determinations, an error of law, or an abuse of its discretion." Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs, 826 F.3d 1030, 1035 (8th Cir. 2016) (quoting Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 893 (8th Cir. 2013)). A factual finding will not be reversed on appeal merely because we are convinced that we would have decided the case differently.

-24-

Rather, a finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).  We will not overturn a preliminary injunction for an abuse of discretion unless the district court failed to consider a relevant factor that should have been given significant weight, gave significant weight to an irrelevant or improper factor, or committed a clear error of judgment in weighing the proper factors.  Planned Parenthood of Ark. & E. Okla. v. Jegley, 864 F.3d 953, 957 (8th Cir. 2017), cert. denied, 138 S. Ct. 2573 (2018).

Deciding whether a preliminary injunction should issue involves a "flexible" consideration of the four factors identified in Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109 (8th Cir. 1981): (1) the threat of irreparable harm to the movant; (2) balancing this harm with any injury that an injunction would inflict on other interested parties; (3) the probability that the movant will succeed on the merits; and (4) the effect on the public interest.  Id. at 114; Richland, 826 F.3d at 1036.  "If the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh the other *Dataphase* factors." Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008).

A

I begin with the only Dataphase factor that the court's opinion addresses: plaintiffs' likelihood of success on the merits of their Fourteenth Amendment claims. Plaintiffs' amended complaint presents two related equal protection claims.  The first challenges H.B. 1369's current RSA requirement.  The second challenges the elimination of the affidavit fail-safe option, originally accomplished by the enactment

of H.B. 1332. In my view, the district court did not clearly err in finding that plaintiffs were likely to succeed on both claims.

It should go without saying—but apparently merits repeating—that the right to vote is both "precious" and "fundamental" to our system of governance. Harper v. Va. State Bd. of Elections, 383 U.S. 663, 670 (1966); Reynolds v. Sims, 377 U.S. 533, 560–62 (1964); Wesberry v. Sanders, 376 U.S. 1, 17 (1964). "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." Reynolds, 377 U.S. at 555. Because "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Id. at 562; see also Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886). If the right to vote is undermined, all "[o]ther rights, even the most basic, are illusory." Wesberry, 376 U.S. at 17.

The Supreme Court has consistently held that the Equal Protection Clause protects the right to vote in several ways, including "the manner of its exercise." Bush v. Gore, 531 U.S. 98, 104 (2000). In Harper, the Court struck down Virginia's $1.50 poll tax as violating the Clause because a voter's ability to pay a poll tax bears no relationship to her voting qualifications. 383 U.S. at 666. It explained that imposing burdens unrelated to a citizen's voting credentials—including "requirements of wealth or affluence or payment of a fee"—constitutes invidious discrimination in violation of the Fourteenth Amendment. Id. at 667.

The Court reaffirmed Harper in Crawford v. Marion County Election Board, 553 U.S. 181 (2008), a case involving Indiana's photo identification statute. Recognizing Harper's holding that "even rational restrictions on the right to vote are invidious if they are unrelated to voter qualifications," Justice Stevens's plurality

-26-

opinion[2] explained how to identify such invidious voting laws: by using a balancing test derived from the Court's decisions in <u>Anderson v. Celebrezze</u>, 460 U.S. 780 (1983), and <u>Burdick v. Takushi</u>, 504 U.S. 428 (1992). <u>Crawford</u>, 553 U.S. at 189. Under the <u>Anderson</u>-<u>Burdick</u> framework, any "burden that a state law imposes on a political party, an individual voter, or a discrete class of voters[,] . . . [h]owever slight[,] . . . must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" <u>Id.</u> at 191 (quoting <u>Norman v. Reed</u>, 502 U.S. 279, 288–89 (1992)). Even rational and modest burdens—like Virginia's $1.50 poll tax—will fail this balancing test if they are ultimately irrelevant to the voter's qualifications, such as when they make "the affluence of the voter or payment of any fee an electoral standard." <u>Id.</u> at 189 (quoting <u>Harper</u>, 383 U.S. at 666).

In <u>Crawford</u>, after weighing the state interests against the burdens supported by the record, the Court ultimately concluded that Indiana's photo identification law satisfied the <u>Anderson</u>-<u>Burdick</u> balancing test. <u>Id.</u> at 204. At first blush, it may be tempting to conclude that North Dakota's laws operate no differently than the Indiana law upheld in <u>Crawford</u>. But a close examination shows that the laws' differences outpace their similarities.

---

[2]The decision in <u>Crawford</u> was fractured; Justice Stevens's plurality opinion was joined by only two other Justices, and Justice Scalia concurred in the judgment joined by two other Justices. Justice Stevens's opinion rests on narrower grounds than Justice Scalia's, thus it is the controlling opinion. <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977); <u>see also</u> <u>Obama for Am. v. Husted</u>, 697 F.3d 423, 441 n.7 (6th Cir. 2012) (White, J., concurring in part and dissenting in part) (acknowledging such).

The Court in Crawford acknowledged that Indiana's law would not survive constitutional scrutiny "if the State required voters to pay a tax or a fee to obtain a new photo identification." Id. at 198. Here, the district court concluded that North Dakota does impose a fee on all state-issued forms of identification. It is undisputed that a driver's license costs, at minimum, fifteen dollars. The Secretary claims that nondriver's identification cards are available for free, but plaintiffs presented contrary evidence that the district court found more credible. At the time of the district court's decision, the North Dakota Department of Transportation's official website plainly indicated that a nondriver's identification card costs eight dollars. Furthermore, one plaintiff testified that she was charged this fee to obtain a card. The district court did not clearly err in finding plaintiffs' evidence more credible.[3] See Anderson, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Taking the facts as found by the district court, obtaining a state-issued identification card—the only "valid form of identification" that most North Dakota residents could possibly obtain—requires payment of a fee.

In addition to the fee, plaintiffs presented significant evidence that obtaining a qualifying state-issued identification imposes a property requirement. Unless the individual is a minor (in which case voting is not an issue), the Department of

_____

[3]After the district court entered its injunction, the Department of Transportation changed its website to indicate that there is no fee for residents eighteen years old or older seeking to obtain their first nondriver's identification card. See Brakebill III, 905 F.3d at 562 n.5 (Kelly, J., dissenting). Because this change occurred only after the district court's order issued, it cannot render the district court's factual finding clearly erroneous. And even if the fee collection was "mistaken[]," supra at 11–12, it still operated so as to require payment of a fee to obtain identification necessary to vote.

Transportation's website indicates that obtaining either a driver's license or nondriver's identification card requires a citizen to present one of five documents, which must contain the individual's name and current physical address: (1) a government-issued property tax form; (2) a mortgage, lease, or rental document; (3) a homeowner's or renter's insurance policy; (4) a utility bill; or (5) a non-cellular phone bill. See Brakebill III, 905 F.3d at 562–63 (Kelly, J., dissenting).[4] An individual cannot acquire any of these documents unless they own or rent real property in their own name.

The court's opinion today brushes these concerns aside by insisting that a voter only needs to show where he or she resides. But that is simply not true. To obtain a state-issued identification card, the prospective voter must jump through multiple hoops and acquire specific forms of underlying documentation. An individual cannot do so without paying a fee and maintaining an interest in property. The Indiana law at issue in Crawford did not impose such requirements, as Indiana offers free identification cards and does not require proof of an interest in property. See Crawford, 553 U.S. at 198 & n.17. Because conditioning the right to vote on the voter's wealth, the payment of a fee, or an interest in property is unconstitutional no

---

[4]The court relies on another document located on the Department of Transportation's website containing a broader list of documents as proof of residential address. However, as I previously explained, nothing on this document indicates that this broader list can be used to obtain a driver's license or nondriver's identification card. See Brakebill III, 905 F.3d at 563 n.6 (Kelly, J., dissenting). The narrower list of documents is what the state identifies as necessary to obtain either card. See Drivers License Requirements, N.D. Dep't of Transp., https://www.dot.nd.gov/divisions/driverslicense/dlrequirements.htm (last visited July 25, 2019) (directing readers to the narrower list under the subheading "Identification Requirements"); ID Card Requirements, N.D. Dep't of Transp., https://www.dot.nd.gov/divisions/driverslicense/idrequirements.htm (last visited July 25, 2019) (same).

matter what justifications the state proffers, see Harper, 383 U.S. at 667–68, plaintiffs are likely to succeed on the merits of their claims.

2

Crawford separately held that a voter identification law may be unconstitutional if the burden it imposes on "a discrete class of voters" outweighs the state's interests in enacting the law. 553 U.S. at 191. The Court acknowledged that Indiana's identification requirements may impose a "heavier burden" on certain populations, but it determined that the Indiana law mitigated any such burden by allowing any voter to cast a ballot that would be counted so long as the voter executed a sworn affidavit. Id. at 199. The Court also faulted the plaintiffs in Crawford for failing to present "any concrete evidence of the burden imposed on voters who currently lack [qualifying] identification." Id. at 201; see also id. at 204 (Scalia, J., concurring in the judgment) (describing Justice Stevens's opinion as resting on the ground "that petitioners have not assembled evidence to show that the special burden is severe enough to warrant strict scrutiny").

Here, plaintiffs have presented ample concrete evidence of the burden H.B. 1369 will impose, and the law contains no fail-safe option to mitigate that burden. Plaintiffs presented substantial statistical evidence about the effect that the elimination of the fail-safe option would have for the Native American population in North Dakota. Plaintiffs' unrebutted evidence shows that 19% of Native American eligible voters in North Dakota lack a form of qualifying identification required under H.B. 1369 due to the current RSA requirement. Roughly half of those individuals also lack sufficient supplemental identification documents to comply with the statute, meaning that at least 2,305 Native Americans simply cannot vote. This amounts to the disenfranchisement of roughly 10% of all voting-age Native Americans in the state. See Citizen Voting-Age Population: North Dakota, U.S. Census Bureau (Nov.

-30-

15, 2016), https://www.census.gov/library/visualizations/2016/comm/ citizen_voting_age_population/cb16-tps18_nd.html.

Plaintiffs also presented evidence that eliminating the fail-safe option indirectly burdens Native Americans to a greater degree than other citizens. Native Americans disproportionately live in severe poverty, so the costs associated with acquiring a state-issued identification (and the necessary underlying documents) burden them to a greater degree. Compared to other North Dakota residents, Native Americans are less likely to have access to transportation, less likely to have internet access, and more likely to have difficulty taking time off work to travel. Even the physical distance that an individual must travel to obtain state-issued identification is, on average, twice as far for Native Americans than non-Native Americans.

The current RSA requirement also disproportionately burdens Native Americans. The requirement that a voter's identification contain an RSA (instead of, for instance, a mailing address) largely affects those with tribal identifications, as state-issued forms of identification already include the individual's RSA. The district court found that Native American communities often lack RSAs. And among those who lack an acceptable identification due to the current RSA requirement, 48.7% of Native Americans do not possess one of the listed supplemental documents bearing their current RSA, compared to 26.2% of non-Native Americans. Brakebill II, 2018 WL 1612190, at *3. Thus, the current RSA requirement disenfranchises 2,305 eligible Native American voters. Id.

The court's opinion today dismisses all of this evidence because 88% of North Dakota voters *do* have a qualifying identification. Supra at 10–11. That most voters already possess acceptable identification does not save the statute. A barrier to voting may be unconstitutional even if most voters can overcome it. See Harper, 383 U.S. at 668 (striking down Virginia's poll tax in toto, regardless of "whether the citizen,

otherwise qualified to vote, has $1.50 in his pocket or nothing at all, pays the fee or fails to pay it"); see also City of Los Angeles v. Patel, 135 S. Ct. 2443, 2451 (2015) ("The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." (quoting Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 894 (1992))).  Those without valid identification—12% of the electorate by the court's estimation—hardly constitutes a "small percentage of voters" who would have no effect on any future election.  But more important, as Crawford acknowledged, a law that imposes a burden on *any* "discrete class" of voters is unconstitutional if it fails the Anderson-Burdick balancing test.  553 U.S. at 190–91.  And there can be no dispute that disenfranchising 10% of North Dakota's Native Americans constitutes a material burden on a discrete class of voters.

Weighing the laws' burdens against the justifications put forward by the Secretary, plaintiffs are likely to prevail on their claims.  The Secretary argued that the laws further the state's interests in preventing voter fraud and maintaining voter confidence in elections.  The district court correctly held that these types of interests are legitimate.  In Crawford, Indiana presented evidence of a distinct risk of voter fraud due to the state's inflated voter rolls.  See 553 U.S. at 192–97.  Indiana's voter identification law directly addressed this risk, outweighing the indeterminate burden on the state's voters.  Here, in contrast, North Dakota presented no "evidence to show voter fraud has ever been a problem" in the state, Brakebill I, 2016 WL 7118548, at *10, making the risk of voter fraud only a "theoretical" concern, Brakebill II, 2018 WL 1612190, at *6.  And North Dakota has offered no evidence to support the inference that H.B. 1369 will measurably reduce the risk of voter fraud.  This is insufficient to justify disenfranchising 10% of the state's Native American voters.  In my view, the district court correctly concluded that plaintiffs have established a likelihood of success on the merits of their Fourteenth Amendment claims.

-32-

B

The remaining <u>Dataphase</u> factors—the threat of irreparable harm to plaintiffs, the injury an injunction would inflict on other interested parties, and the effect on the public interest—also weigh in favor of granting preliminary injunctive relief. Imposing an excessive burden on the right to vote irreparably harms voters. <u>Husted</u>, 697 F.3d at 436–37; <u>see</u> <u>Reynolds</u>, 377 U.S. at 561–62. The district court determined that the Secretary's interests in preserving voter confidence and preventing "the theoretical possibility of voter fraud" are outweighed by "the public interest in protecting the most cherished right to vote." <u>Brakebill II</u>, 2018 WL 1612190, at *6–7. I agree.

On appeal, the Secretary argues that the preliminary injunction issued by the district court "expressly enables" fraudulent voting by someone who resides outside North Dakota but maintains a P.O. Box within the state. But other aspects of the challenged statute not covered by the preliminary injunction expose the remoteness of such a possibility: the nonresident would still need to obtain a tribal- or state-issued identification card, neither of which may be issued to a non-North Dakota resident. <u>See</u> <u>Brakebill III</u>, 905 F.3d at 564 (Kelly, J., dissenting). This overblown concern does not outweigh the other factors favoring relief. In my view, the district court did not abuse its broad discretion in weighing the <u>Dataphase</u> factors and determining that preliminary injunctive relief was warranted.

IV

That brings me to the scope of relief available to plaintiffs. The court criticizes the relief ordered by the district court as overbroad, implying that a statewide injunction is not warranted because any unjustified burden is placed on a "relatively small percentage of eligible voters." I disagree. A statute that imposes an unjustified

-33-

burden on voting is unconstitutional in all its applications, even if some voters are able to comply with it. See Harper, 383 U.S. at 668.

The district court was faced with two problematic provisions of North Dakota law: the current RSA requirement and the elimination of the affidavit option. In a carefully crafted order, the district court enjoined the current RSA requirement only in part, requiring the state to accept identification or supplemental documentation bearing a mailing address instead of an RSA. As for the elimination of the affidavit option, the district court would have been within its discretion to simply re-instate its previous injunction, which had stood through the 2016 election without incident. Indeed, plaintiffs presented evidence suggesting that many Native American voters had to utilize the affidavit option in 2016 because of the new identification requirements. See Brakebill II, 2018 WL 1612190, at *3 (indicating a 665% increase in the use of the affidavit option between 2012 and 2016 in the three counties with the highest percentage of Native American voters). But the district court attempted to craft a more narrow remedy. In light of H.B. 1369's new provisional ballot system, and in light of the Secretary's concessions that the state would accept a broad range of forms of tribal identification, the district court held the Secretary to his commitment that BIA-issued identification and tribal-issued letters would be accepted as either valid identification or supplemental documentation. It also ordered the Secretary to comply with his obligation under N.D. Cent. Code § 16.1-01-04.1(6) to clarify the procedures for voters to get their provisional ballots counted. The district court imposed no substantive limits on, nor a timeframe for, his compliance.

This limited remedy was not an abuse of discretion. "Crafting a preliminary injunction is an exercise of discretion and judgment . . . . In the course of doing so, a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." Trump v. Int'l Refugee Assistance Project, 137 S. Ct. 2080, 2087 (2017) (per curiam) (cleaned up). The relief ordered

by the district court addresses the most burdensome aspects of the challenged laws while leaving the rest of the provisions intact. Indeed, other than allowing tribal members to vote using a mailing address after showing tribal identification (which proves they are state residents), the injunction does nothing except memorialize the Secretary's litigation positions and statutory obligations. Ordering the Secretary to adhere to the interpretation of the law that he advanced in this very litigation does not constitute an abuse of discretion meriting reversal.

It is especially puzzling that the court today vacates the aspects of the district court's injunction that the Secretary did not even seek to stay prior to the 2018 election. The court's opinion says that it is "unnecessary at this juncture to address" the acceptability of BIA-issued identification cards and tribal letters, supra at 12, and asserts that there "might" be no problem with the provisional ballot system, supra at 13, but vacates these portions of the preliminary injunction anyway. These aspects of the injunction remained in place during the 2018 election, and there is no indication that the district court's order was unworkable or allowed for voter fraud.

"The abuse-of-discretion standard means 'the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" Novus Franchising, 725 F.3d at 895 (quoting Kern v. TXO Prod. Corp., 738 F.2d 968, 970 (8th Cir. 1984)). The district court here was in a unique position to appreciate H.B. 1369's effect on Native American voters' access to the ballot in light of North Dakota's particular demographic and geographic circumstances; it crafted a limited injunction tailored to address those realities. The district court's form of relief does not fall outside the range of permissible choices available, and therefore I would not disturb the decision.

-35-

# V

On remand, many options remain available to plaintiffs and to the district court. The district court's preliminary injunction was predicated solely on plaintiffs' equal protection claims and did not address their claims under the Voting Rights Act or the North Dakota Constitution. Today's decision does not foreclose plaintiffs from renewing their request for the resurrection of the affidavit fail-safe option as a remedy for their claims not at issue in this appeal. Nor does it prevent the district court from providing that relief. Today's opinion also does not prevent the district court from fashioning a narrower form of relief applicable only to those without qualifying identification.

For the reasons identified above, I respectfully dissent.

_____