# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1791

_____

In re: Leslie Rutledge, in her official capacity as Attorney General of the State of Arkansas; Larry Jegley, in his official capacity as Prosecuting Attorney of Pulaski County; Matt Durrett, in his official capacity as Prosecuting Attorney of Washington County; Sylvia D. Simon, M.D., in her official capacity as Chairman of Arkansas State Medical Board; Robert Breving, M.D., in his official capacity as member of the Arkansas State Medical Board; Veryl D. Hodges, D.O., in his official capacity as member of the Arkansas State Medical Board; John H. Scribner, M.D., in his official capacity as member of the Arkansas State Medical Board; Omar Atiq, M.D., in his official capacity as member of the Arkansas State Medical Board; Rhys L. Branman, M.D., in his official capacity as member of the Arkansas State Medical Board; Rodney Griffin, M.D., in his official capacity as member of the Arkansas State Medical Board; Marie Holder, in her official capacity as member of the Arkansas State Medical Board; Brian T. Hyatt, M.D., in his official capacity as member of the Arkansas State Medical Board; Larry D. Lovell, "Buddy" in his official capacity as member of the Arkansas State Medical Board; Timothy C. Paden, M.D., in his official capacity as member of the Arkansas State Medical Board; Don R. Phillips, M.D., in his official capacity as member of the Arkansas State Medical Board; William L. Rutledge, M.D., in his official capacity as member of the Arkansas State Medical Board; David L. Staggs, M.D., in his official capacity as member of the Arkansas State Medical Board; Nathan Smith, M.D., M.P.H., in his official capacity as Director and State Health Officer of the Arkansas Department of Health

*Petitioner*s

-------------------------------

American Academy of Family Physicians

*Amicus Curiae*

State of Alabama

*Amicus on Behalf of Petitioner*

American Academy of Nursing

*Amicus Curiae*

State of Alaska

*Amicus on Behalf of Petitioner*

American Academy of Pediatrics

*Amicus Curiae*

State of Idaho

*Amicus on Behalf of Petitioner*

American College of Osteopathic Obstetricians and Gynecologists

*Amicus Curiae*

State of Indiana

*Amicus on Behalf of Petitioner*

American Psychiatric Association

*Amicus Curiae*

State of Kentucky

*Amicus on Behalf of Petitioner*

American Society for Reproductive Medicine

*Amicus Curiae*

State of Louisiana

*Amicus on Behalf of Petitioner*

North American Society for Pediatric and Adolescent Gynecology

*Amicus Curiae*

State of Mississippi

*Amicus on Behalf of Petitioner*

National Association of Nurse Practitioners in Women's Health

*Amicus Curiae*

State of Missouri

*Amicus on Behalf of Petitioner*

Society of Family Planning

*Amicus Curiae*

State of Montana

*Amicus on Behalf of Petitioner*

Society of Gynecologic Surgeons

*Amicus Curiae*

State of Nebraska

*Amicus on Behalf of Petitioner*

Society of OB/GYN Hospitalists

*Amicus Curiae*

State of Oklahoma; State of Ohio; State of South Dakota; State of South Carolina; State of Tennessee; State of Texas; State of Utah; State of West Virginia; American Center for Law and Justice

*Amici on Behalf of Petitioner*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central
_____

Submitted: April 16, 2020
Filed: April 22, 2020
_____

Before LOKEN, SHEPHERD, and ERICKSON, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

The State of Arkansas[1] petitions for a writ of mandamus after the district court entered a temporary restraining order (TRO) enjoining it from enforcing a health directive against a provider of surgical abortions. Having jurisdiction under 28 U.S.C. § 1651(a), we grant the writ of mandamus in part and direct the district court

_____

[1]Petitioners are elected and appointed state officials, hereinafter referred to as the State of Arkansas or the State.

to dissolve the TRO.  We deny the pending emergency motion to stay the ex parte TRO and for a temporary administrative stay as moot.

I.

Arkansas, along with the rest of the nation and the world, is in the midst of an unprecedented health crisis occasioned by the worldwide COVID-19 pandemic. Every day, the number of people infected with COVID-19 continues to rise, along with the virus's death toll.  As of April 20, 2020, testing has revealed 746,625 cases in the United States with 39,083 deaths.[2]  In Arkansas, as of April 20, 2020, 1,853 cases have been confirmed with 41 deaths.[3]   Experts believe that hospitalizations related to the disease have not yet peaked within the state, and personal protective equipment (PPE) for healthcare workers is in short supply while concerns remain about the demand for ventilators.  In response to the COVID-19 pandemic, Arkansas has issued a number of emergency orders and directives in order to slow the spread of the disease and prevent hospitals and other healthcare providers from becoming overwhelmed due to the rising number of patients.  These include the closing of schools for the remainder of the academic year, requiring state employees to telework, prohibiting restaurants and bars from offering dine-in service, and requiring healthcare facilities to screen staff and visitors for fever and other symptoms.

---

[2]Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Cases in the US, (last updated Apr. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[3]Arkansas Department of Health, COVID-19, (last updated Apr. 20, 2020), https://www.healthy.arkansas.gov/programs-services/topics/novel-coronavirus.

A.

One such directive from the Arkansas Department of Health (ADH), issued on April 3, 2020, requires that all non-medically necessary surgeries be postponed. The purpose of this directive is multifold, but it primarily stems from a need to preserve existing PPE resources and limit social contact among patients, healthcare providers, and hospital staff. The directive itself is facially neutral: it applies to all types of surgical procedures. Currently, only those procedures that are deemed to be immediately necessary may take place. If it is safe to postpone an elective surgery, then it must be postponed. However, it is left to a patient's healthcare provider to determine whether a surgery is immediately necessary or whether it may be safely performed at a later date.

On March 11, 2020, the Governor of Arkansas signed Executive Order 20-03, directing the ADH to "do everything reasonably possible to respond to and recover from the COVID-19 virus." The ADH directive was subsequently promulgated in response to Executive Order 20-03 and pursuant to the ADH's general authority under Ark. Code Ann. §§ 20-7-109, 20-7-110. Although it has no explicit expiration date, and "while neither the ADH nor [the Governor of Arkansas] have determined how long [the directive] will remain in effect," the current state of emergency declared by the State of Arkansas may not continue "for longer than sixty (60) days unless renewed by the Governor." Ark. Code Ann. § 12-75-107(b)(2). In that the current state of emergency was declared on March 11, 2020, under state law, it may last no longer than May 10, 2020, unless renewed by the Governor of Arkansas.[4] The

---

[4]It bears mentioning that the President, on March 13, 2020, issued a proclamation declaring a National Emergency concerning COVID-19. Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 18, 2020).

State concedes in its brief that, absent an extension to the current state of emergency, the ADH directive must expire on May 11, 2020.[5]

B.

Surgical abortions, like other surgical procedures, ordinarily require providers to use PPE to prevent "exposure to blood and other bodily fluids and tissue, and to protect the patient from infection." The relevant PPE in a surgical abortion could include a surgical mask, gloves, gown, and eye protection. Moreover, given the increasing risk of infection, all patients who undergo any type of surgical procedure may themselves need to use PPE in order to avoid contracting COVID-19. Unless deemed immediately medically necessary by a woman's healthcare provider, surgical abortions are prohibited under the ADH directive. It appears, however, that non-surgical abortions, such as medication abortions, may still continue—again, the directive only prohibits elective or non-emergency surgical procedures.

On April 9, 2020, inspectors from the ADH conducted an unannounced inspection of the Little Rock Family Planning Services (LRFP) facility, which is a provider of surgical abortions in Arkansas. It was found that the facility was still providing surgical abortions that were not deemed immediately necessary. The following day, April 10, 2020, the ADH sent LRFP a cease-and-desist letter stating that LRFP was violating the ADH directive and ordering it to stop performing non-emergency abortion surgeries. That letter stated that surgical abortions, consistent

_____

[5]The White House recently issued guidelines that are meant to advise local and state governments on when it is safe to ease existing restrictions and begin reopening the economy. White House, Guidelines: Opening Up America Again (Apr. 16, 2020), https://www.whitehouse.gov/openingamerica/. This seems to suggest that, as time goes on, state and local governments will prepare to relax measures intended to combat the spread of COVID-19.

with the ADH directive, may not take place "except where immediately necessary to protect the life or health of the patient."

C.

On April 13, 2020, LRFP challenged the ADH directive in federal district court. However, instead of filing a new action in the district court, it sought leave to file a supplemental complaint in a pending case filed on June 26, 2019. See Little Rock Family Planning Servs. v. Rutledge, No. 4:19-CV-00449-KGB (E.D. Ark. filed June 26, 2019). In that case, LRFP, along with other plaintiffs, challenged the constitutionality of three separate abortion-related laws passed by the Arkansas General Assembly. The district court preliminarily enjoined Arkansas from enforcing those statutes, and the State has taken an interlocutory appeal from that injunction. See Little Rock Family Planning Servs. v. Rutledge, No. 19-2690. That appeal remains pending before this Court. See id.

In the supplemental complaint, LRFP challenged the ADH directive as it applies to surgical abortions. It alleges that, rather than being motivated by any concern for public health, the directive is "the latest effort in the State's long-running campaign to eliminate women's access to constitutionally guaranteed health care" and that it effectively operates as a ban on pre-viability surgical abortions.

That same day, after moving for leave to file the supplemental complaint, LRFP moved for an ex parte TRO. The following day, on April 14, 2020, the district court entered a TRO enjoining the State from enforcing the directive against surgical-abortion providers. Now, unlike all other surgical procedures, Arkansas cannot proscribe non-emergency surgical abortions in its effort to conserve PPE and to limit social contact.

-8-

The State filed the instant petition for a writ of mandamus directing the district court to dissolve the ex parte TRO and dismiss the supplemental complaint. It also has moved to stay the district court's TRO and for expedited briefing and consideration of the motion and petition. We entered an order granting expedited briefing on the motion and petition, and we now consider the merits of the State's petition for mandamus relief.

## II.

Mandamus relief is an "extraordinary remedy" to be employed only under the most "exceptional circumstances." Will v. United States, 389 U.S. 90, 95 (1967). In order to obtain it, petitioners must show that they "have no other adequate means to attain the relief [they] desire[ ]." Cheney v. U.S. Dist. Ct. for D.C., 542 U.S. 367, 380 (2004) (internal quotation marks omitted). Indeed "[t]he traditional use of the writ . . . has been to confine [the court against which mandamus is sought] to a lawful exercise of its prescribed jurisdiction." Id. (third alteration in original) (internal quotation marks omitted). Put differently, mandamus may only lie in "exceptional circumstances amounting to a judicial usurpation of power, or a clear abuse of discretion." Id. (internal quotation marks and citations omitted). "[A] clear error of law or clear error of judgment leading to a patently erroneous result may constitute a clear abuse of discretion." In re Apple, Inc., 602 F.3d 909, 911 (8th Cir. 2010) (per curiam).

> To grant a writ of mandamus, this court weighs three factors: (1) the petitioning party must satisfy the court that he has no other adequate means to attain the relief he desires; (2) his entitlement to the writ is clear and indisputable; and (3) the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.

In re Kemp, 894 F.3d 900, 905 (8th Cir. 2018) (internal quotation marks omitted).

We first consider whether the State is entitled to mandamus relief concerning the district court's entry of the order granting the TRO. We conclude that it is, and in so holding, adopt the reasoning of the Fifth Circuit in In re Abbott, No. 20-50264, 2020 WL 1685929 (5th Cir. April 7, 2020). Indeed, the State has satisfied its burden in demonstrating that it has no other means to obtain the relief that it seeks, that it is clearly and indisputably entitled to the writ, and that entry of the writ is appropriate under the circumstances.

A.

First, we find that the State has no other means to attain the relief that it seeks. This "condition [is] designed to ensure that the writ will not be used as a substitute for the regular appeals process." Cheney, 542 U.S. at 380-81. In light of the "surging tide of COVID-19 cases and deaths, [the State has] made this showing." In re Abbott, 2020 WL 1685929, at *14.

Under 28 U.S.C. § 1292(a)(1), courts of appeals have jurisdiction "to review [i]nterlocutory orders of the district courts of the United States . . . or of the judges thereof, . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court." Nordin v. Nutri/System, Inc., 897 F.2d 339, 341 (8th Cir. 1990) (alterations in original) (internal quotation marks omitted). We have, however, interpreted this to mean that we would ordinarily lack jurisdiction to hear an interlocutory appeal from the district court's grant or denial of a TRO. See Schlafly v. Eagle Forum, 771 F. App'x 723, 724 (8th Cir. 2019) (per curiam); see also S. Wind Women's Ctr. LLC v. Stitt, No. 20-6045, 2020 WL 1860683 (10th Cir. April 13, 2020) (dismissing interlocutory appeal from a similar order granting a TRO for lack of jurisdiction); Pre-Term Cleveland v. Att'y Gen. of Ohio, No. 20-3365, 2020 WL

1673310, at *1 (6th Cir. April 6, 2020) (per curiam) (noting that jurisdiction did not lie in the court of appeals from a similar order granting a TRO). If a litigant would suffer "serious, perhaps irreparable consequence" from the district court's TRO, then an interlocutory appeal may properly lie from that order. Hunter v. Bradford, 642 F. App'x 648, 649 (8th Cir. 2016) (per curiam) (quoting Carson v. Am. Brands, Inc., 450 U.S. 79, 84 (1981)). However, "where mandamus is clearly an appropriate remedy, we are not bound to require that the petitioner first seek interlocutory review." In re Apple, 602 F.3d at 912. Therefore, even if we assumed, without deciding, that an interlocutory appeal from the district court's TRO is available to the State, we may nevertheless consider the petition for a writ of mandamus. See id.

Moreover, given the broader context of the COVID-19 pandemic, we agree with the Fifth Circuit that "[i]n mill-run cases, it might be a sufficient remedy to simply wait until the expiration of the TRO, and then appeal an adverse preliminary injunction. In other cases, a surety bond may ensure that a party wrongfully enjoined can be compensated for any injury caused. Those methods would be woefully inadequate here." In re Abbott, 2020 WL 1685929, at *14 (internal citations omitted). Day after day, the number of individuals testing positive for, and dying from, COVID-19 continues to climb both in Arkansas and nationally. Additionally, PPE continues to be used in hospitals each day. The "peak" of infections in Arkansas has not yet occurred, and if the State were "required to wait and appeal an adverse preliminary injunction, the harms from a . . . suspension of [the ADH directive] for all [surgical abortions] could not be put back in the bottle." Id. (internal quotation marks omitted).

Also relevant to the issue of whether the State has no other means to attain the relief that it seeks is the fact that LRFP chose to seek judicial relief from the ADH directive via a motion for permission to file a supplemental complaint in Little Rock Family Planning Servs., No. 4:19-CV-00449-KGB, rather than by instituting a new action. LRFP took this path even though that case has been confined to the

consideration of a challenge to certain laws passed by the Arkansas General Assembly, a matter now on appeal to this Court, and did not involve a challenge to the very recent ADH directive, which was issued pursuant to an executive order from the Governor of Arkansas. As discussed below, utilization of this procedure in the context of this case is procedurally suspect at best, however, the order permitting the filing of the supplemental complaint is interlocutory and not appealable until entry of final judgment. Thus, the State has no ability to challenge the amended complaint which gave rise to the TRO.

Accordingly, we are satisfied that the State has no other means to attain the relief that it seeks.

B.

Second, we address whether the State has a clear and indisputable right to issuance of the writ. A petitioner's right to issuance of the writ is clear and indisputable "only [in] exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion." Cheney, 542 U.S. at 380 (internal quotation marks and citations omitted). The Supreme Court has sanctioned the use of the writ "to restrain a lower court when its actions would threaten the separation of powers by embarrass[ing] the executive arm of the Government, or result in the intrusion by the federal judiciary on the delicate area of federal-state relations." Id. at 381 (alteration in original) (internal quotation marks and citations omitted).

We conclude that the State has shown that it is clearly and indisputably entitled to issuance of the writ. In issuing the TRO, the district court first interpreted the ADH directive as "prohibit[ing] nearly all pre-viability abortions past 10 weeks LMP [(last menstrual period)]." On that basis, the court found the directive to be "facially unconstitutional," and thus concluded that LRFP was likely to prevail on the merits. See Gonzales v. Carhart, 550 U.S. 124, 146 (2007) (noting that the Supreme Court

has held that the Constitution restricts states from "prohibit[ing] any woman from making the ultimate decision to terminate" a pre-viability pregnancy (quoting <u>Planned Parenthood of Se. Penn. v. Casey</u>, 505 U.S. 833, 879 (1992) (plurality opinion)). In reaching this conclusion, however, the court failed to meaningfully apply the Supreme Court's framework for reviewing constitutional challenges to state actions taken in response to a public health crisis. Such a failure constitutes a clear abuse of discretion.

In <u>Jacobson v. Massachusetts</u>, 197 U.S. 11 (1905), the Supreme Court held that, when faced with a public health crisis, a state may implement measures that infringe on constitutional rights, subject to certain limitations. The Court explained that the "liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." <u>Id.</u> at 26. Rather, "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." <u>Id.</u> at 27. Therefore, while constitutional rights do not disappear during a public health crisis, "the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." <u>Id.</u> at 29. With these conflicting considerations in mind, the Court set forth the following two-part framework: in the context of a public health crisis, a state action is susceptible to constitutional challenge only if it, "purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law[.]" <u>Id.</u> at 31. As the Fifth Circuit accurately explained,

> [t]he bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental

-13-

law." Courts may ask whether the state's emergency measures lack basic exceptions for "extreme cases," and whether the measures are pretextual—that is, arbitrary or oppressive. At the same time, however, courts may not second-guess the wisdom or efficacy of the measures.

In re Abbott, 2020 WL 1685929, at *7 (quoting Jacobson, 197 U.S. at 31, 38).

Here, the ADH directive, pursuant to the Governor's Executive Order, was issued in response to the impact of the COVID-19 pandemic in Arkansas. Accordingly, even assuming, arguendo, that the district court correctly interpreted the directive to be an outright ban on all pre-viability surgical abortions in Arkansas, the directive is not subject to constitutional challenge unless it "has no real or substantial relation to" the public health crisis, or "is, beyond all question, a plain, palpable invasion of" a woman's right to elective abortion. Jacobson, 197 U.S. at 31; see also In re Abbott, 2020 1685929, at *8 ("[T]he effect on abortion arising from a state's emergency response to a public health crisis must be analyzed under the standards in Jacobson."). Aside from summarily stating that its conclusion is consistent with Jacobson, the district court failed to apply that requisite framework and, thus, abused its discretion.

Furthermore, we find that the district court's failure to apply the Jacobson framework produced a patently erroneous result. As discussed, Jacobson provides that a court may review a constitutional challenge to a government's response to a public health crisis only if the state's response lacks a "real or substantial relation" to the public health crisis or it is, "beyond all question, a plain, palpable invasion" of the right to abortion. 197 U.S. at 31. We address each prong separately.

1.

Under Jacobson, we must first consider whether the ADH directive has a "real or substantial relation" to the public health crisis in Arkansas brought about by the

-14-

COVID-19 pandemic. <u>Id.</u> at 31. In our analysis, we must take care not to "usurp the functions of another branch of government," <u>id.</u> at 28, such as by "second-guess[ing] the state's policy choices in crafting emergency public health measures." <u>In re Abbott</u>, 2020 WL 1685929, at *6.

LRFP argues that the district court correctly found that there is no real or substantial relationship between the ADH directive and the State's public health rationale. In support, it points out that it is "wholly self-sustaining in terms of PPE, and has no intent of utilizing the State's stockpile." Moreover, it contends that requiring women to continue their pregnancies will actually utilize more PPE and hospital resources than allowing non-emergency surgical abortions. Put differently, LRFP does not suggest that the ADH directive itself bears no real or substantial relation to public health—rather, it argues that the directive has no real or substantial relation to public health as applied to surgical abortions.

At the outset, we note that although the district court's analysis of <u>Jacobson</u> was perfunctory, it did acknowledge the State's "legitimate interests in protecting or promoting the public's health and safety during the COVID-19 panic." And as discussed above, the ADH directive has stopped *all* elective or non-emergency surgical procedures, not just surgical abortions, in order to deal with PPE shortages, the rising number of people infected with COVID-19, and existing burdens on hospitals and other healthcare facilities. On the record before us, the State's interest in conserving PPE resources and limiting social contact among patients, healthcare providers, and other staff is clearly and directly related to public health during this crisis. That interest is being effectuated by the ADH directive. The directive is a legally valid response to the circumstances confronted by the Governor and state health officials. As the Fifth Circuit has noted, this is similar to other extreme measures that the State has taken, such as closing schools, prohibiting gatherings of more than ten people, and prohibiting restaurants and bars from offering dine-in services. <u>See</u> <u>id.</u> at *9 (noting that such "measures would be constitutionally

-15-

intolerable in ordinary times, but are recognized as appropriate and even necessary responses to the present crisis").

Additionally, we find unpersuasive LRFP's arguments that the ADH directive, as applied to surgical abortions, fails to bear a real or substantial relation to public health. First, we do not read Jacobson to require that courts take a piecemeal approach and scrutinize individual surgical procedures or otherwise create an exception for particular providers, such as those performing non-emergency, surgical abortions. Indeed, this would encroach upon the State's policy determinations in how best to combat COVID-19, and we are not empowered to "usurp the functions of another branch of government." Jacobson, 197 U.S. at 28. Second, we are not convinced by LRFP's contention that it has a self-sustaining amount of PPE and that it will not draw upon state stockpiles—the purpose behind the ADH directive is that, by delaying all non-emergency surgeries, conservation of a finite amount of PPE resources across Arkansas may be possible today. Additionally, the fact that LRFP has its own reserve of PPE does not lessen the problem of additional social contact between patients and providers. Third, the claim that non-emergency surgical abortions actually further the State's public health goals by reducing the demand for PPE required for pre-natal care and delivery and reducing the burden on hospitals occasioned by continued pregnancies and childbirths is a policy argument, and the judiciary may not "second-guess the state's policy choices in crafting emergency public health measures." In re Abbott, 2020 WL 1685929, at *6.

For these reasons, and on this record, we conclude that the ADH directive bears a real and substantial relation to the State's interest in protecting public health in the face of the COVID-19 pandemic.[6]

---

[6]We also note that the record does not suggest that the Governor of Arkansas or the ADH issued the directive in an attempt to deliberately "exploit[] the present crisis as a pretext to target abortion providers sub silentio." In re Abbott, 2020 WL 1685929, at *13 (citing Lawton v. Steele, 152 U.S. 133, 137 (1894)).

-16-

2.

The second <u>Jacobson</u> inquiry is whether the ADH directive is "beyond all question, a plain, palpable invasion" of the right to abortion. The Supreme Court has held that the Constitution imposes two restrictions on a state's ability to regulate abortion. The first, addressed above, is that a state "may not prohibit any woman from making the ultimate decision to terminate" a pre-viability pregnancy. <u>Gonzales</u>, 550 U.S. at 146 (quoting <u>Casey</u>, 505 U.S. at 879). The second constitutional restriction is that a state "may not impose upon this right an undue burden, which exists if a regulation's 'purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" <u>Id.</u> (quoting <u>Casey</u>, 505 U.S. at 878). Accordingly, in order for the court to have the authority to intervene in the State's response to the public health crisis, the ADH directive must, "beyond all question," violate at least one of these constitutional restrictions. On the record before the district court, we find that it does not.

a.

The ADH directive does not operate as an outright ban on all or virtually all pre-viability abortions. First, the directive does not apply to medication abortions, which are available in Arkansas up to 10 weeks LMP. Moreover, contrary to the district court's finding, the directive does not operate as an outright ban on pre-viability abortions for women who are past 10 weeks LMP or for whom medication abortion is contraindicated.

In finding that the directive "prohibit[s] virtually all pre-viability abortions after 10 weeks LMP and prohibit[s] virtually all pre-viability abortions for patients for whom medication abortion is contraindicated," the district court interpreted the directive to be indefinite. However, Arkansas law provides that "[n]o state of disaster emergency may continue for longer than sixty (60) days unless renewed by the

Governor." Ark. Code Ann. § 12-75-107(b)(2). The Governor declared a state of emergency on March 11, 2020. Accordingly, the ADH directive, which was issued pursuant to the Governor's emergency powers and the ADH's general authority under Ark. Code Ann. §§ 20-7-109, 20-7-110, will necessarily expire on May 11, 2020 unless the Governor renews the state of emergency. Such an expiration date makes the ADH directive a delay, not a ban. "The Supreme Court has repeatedly upheld a wide variety of abortion regulations that entail some delay in the abortion but that serve permissible Government purposes." Garza v. Hargan, 874 F.3d 735, 755 (D.C. Cir. 2017) (en banc) (Kavanaugh, J., dissenting), vacated sub nom. Azar v. Garza, 138 S. Ct. 1790 (2018).

Moreover, the directive contains emergency exceptions, including where "there is a threat to the patient's life if the procedure is not performed." The directive explicitly applies only to "surgical abortions that are not immediately necessary to protect the life or health of the patient." Accordingly, the directive complies with Jacobson's requirement that the emergency measures contain basic exceptions for "extreme cases."

"Properly understood, then, [the ADH directive is] a temporary postponement of all non-essential medical procedures, including abortion, subject to facially broad exceptions." In re Abbott, 2020 WL 1685929, at *10. We agree with the Fifth Circuit's conclusion that such an emergency measure "does not constitute anything like an 'outright ban' on pre-viability abortion[.]" Id. Accordingly, the ADH directive is not, beyond all question, a prohibition of pre-viability abortion in violation of the Constitution.

b.

Finally, we turn to whether the ADH directive, beyond all question, imposes an "undue burden" on a woman's ability to choose whether to terminate a pre-

-18-

viability pregnancy.  Casey, 505 U.S. at 876.  A state action imposes an "undue burden" when it places a "substantial obstacle in the path of a woman seeking an abortion before the fetus obtains viability."  Id. at 878.  "Not all burdens on the right to decide whether to terminate a pregnancy will be undue."  Id. at 876.  Further, for a burden to be facially undue, the benefits of the directive must be "substantially outweighed by the burdens it imposes on a large fraction of women seeking" non-essential surgical abortion in Arkansas.  Planned Parenthood of Ark. & E. Okla. v. Jegley, 864 F.3d 953, 960 n.9 (8th Cir. 2017).  Applying this standard within the Jacobson framework, the question is whether the burdens imposed by the ADH directive on a large fraction of women seeking non-essential surgical abortions in Arkansas "beyond all question" substantially outweigh the benefits to the State.

Because the district court erroneously found the ADH directive to be per se unconstitutional as a prohibition on nearly all pre-viability abortions, it determined that Casey's undue burden standard does not apply to its analysis.  The court nonetheless concluded that, "[e]ven if the undue-burden standard applies[,] . . . the Supplemental Complaint Plaintiffs are likely to prevail because the burdens of the Challenged Provisions far outweigh their purported benefits."  We find that, in its perfunctory analysis of Casey's undue burden standard, the district court committed clear abuses of discretion and, further, usurped the functions of the state government by second-guessing the State's policy choices in responding to the COVID-19 pandemic.  Moreover, the district court failed to consider whether LRFP satisfied Casey's undue burden standard "beyond all question," as required under Jacobson.

First, in assessing the benefits of the directive, the district court found that LRFP is likely to prevail on its argument that the directive does not meaningfully further the State's admittedly legitimate interests in protecting or promoting the public's health and safety during the COVID-19 pandemic.  However, the purpose of the ADH directive is to delay *all* non-emergency surgeries so that the State may conserve its finite amount of PPE resources and limit social contact among patients,

healthcare providers, and other staff. As discussed above, this facially-neutral directive has a real and substantial relation to the State's interest in combating the COVID-19 pandemic, and the directive's benefits in addressing this public health crisis are clear. Further, the district court's conclusory determination that the directive does not meaningfully address the COVID-19 pandemic constitutes an improper "second-guess[ing of] the state's policy choices in crafting its emergency public health measures." In re Abbott, 2020 WL 1685929, at *6. Accordingly, we find that the district court abused its discretion by erroneously minimizing the directive's benefits in combating the public heath crisis.

Next, in assessing the claimed burdens of the directive, the district court found that LRFP is likely to prevail on its argument that, in a large fraction of cases in which the directive is relevant, the directive will likely operate as a substantial obstacle to a woman's choice to undergo an abortion. There are two issues with the district court's finding. First, the court's determination that a "large fraction" of women will face a substantial obstacle in seeking a pre-viability abortion is based on the court's erroneous finding that the directive indefinitely postpones non-essential surgical abortions. As discussed, however, the directive is not indefinite; it merely postpones non-essential surgical abortions until May 11, unless the Governor renews the state of emergency declaration for another sixty days. Because we must apply Jacobson's "beyond all question" standard to our analysis, we cannot say that it is beyond all question that the state of emergency will continue beyond May 11. Accordingly, the district court abused its discretion in assuming that the directive will continue indefinitely.

Further, the district court failed to conduct any analysis to support its finding that a "large fraction" of women would face a substantial obstacle in seeking pre-viability abortions. Specifically, the court did not determine the number of women currently seeking but unable to obtain a surgical abortion in Arkansas; how many of those women will be past the legal limit for obtaining an abortion by May 11; how

-20-

many of those women will be forced to obtain a dilation and evacuation (D&E) abortion instead of an aspiration abortion by May 11; or how many of those women will be forced to undergo a two-day D&E abortion instead of the one-day procedure by May 11. "As a result, we are left with no concrete district court findings estimating the number of women who would be unduly burdened by [the ADH directive] . . . and whether they constitute a 'large fraction' of women seeking [non-essential surgical] abortions in Arkansas[.]" Jegley, 864 F.3d at 960. Accordingly, we find that the district court clearly abused its discretion in finding that LRFP is likely to prevail on its argument that, in a large fraction of cases in which the directive is relevant, the directive will likely operate as a substantial obstacle to a woman's choice to undergo an abortion.

We conclude that the State is clearly and indisputably entitled to issuance of the writ.

C.

Finally, we consider whether it is appropriate to exercise our discretion to issue the writ in light of the circumstances of this case. See Kerr v. U.S. Dist. Ct. for N. Dist. of Cal., 426 U.S. 394, 403 (1976) (noting that "it is important to remember that issuance of the writ is in large part a matter of discretion with the court to which the petition is addressed"). "The longstanding view is that discretion to issue the writ[] should be exercised only in special cases . . . ." In re Abbott, 2020 WL 1685929, at *15 (second alteration in original) (quoting 16 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3933 (3d ed. 2019)).

Because of the impact of the ongoing global pandemic in Arkansas, "[w]e are persuaded that this petition presents an extraordinary case justifying issuance of the writ." Id. As discussed above, the total number of Arkansas residents infected with, and dying from, COVID-19 is growing daily; PPE continues to be used; and state

officials remain concerned with continued spread of the disease, supply shortages, and burdens on hospitals and other healthcare facilities. Because "even a minor delay in fully implementing the [S]tate's emergency measures could have major ramifications," it is appropriate for us to exercise our discretion in issuing the writ. Id.

Our conclusion is supported by our concern that the district court committed a serious error in failing to meaningfully apply the Jacobson framework, which resulted in a clear abuse of discretion. The consequence of this error, which effectively "bestow[ed] on [surgical] abortion providers a blanket exemption from a generally-applicable emergency public health measure," is magnified because of its "effect on the [S]tate's ongoing emergency efforts to slow COVID-19." Id. Further, we think that in so doing, the district court "usurped the power of state authorities by passing judgment on the wisdom and efficacy of . . . emergency measures" in the midst of a public health crisis. Id. Mandamus is an appropriate remedy to correct this error.

IV.

Finally, we consider whether the State is entitled to mandamus relief concerning the district court's order granting LRFP leave to file the supplemental complaint pursuant to Federal Rule of Civil Procedure 15(d). We begin by noting that we lack appellate jurisdiction to review the district court's decision to allow LRFP to file the supplemental complaint. Mo.-Kan.-Tex. R. Co. v. Randolph, 182 F.2d 996, 999 (8th Cir. 1950) ("We think the order granting plaintiffs leave to file their supplemental and dependent bill of complaint was not appealable."); 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1504 (3d ed. 2019) ("The decision to permit or deny leave to file a supplemental pleading is interlocutory and cannot be reviewed except on an appeal from the final judgment."). Further, this is not the sort of error ordinarily entitled to mandamus relief. See Kay Ferer, Inc. v.

Hulen, 160 F.2d 146, 149 (8th Cir. 1947) (denying petition for writ of mandamus to set aside order allowing supplemental complaint).

Nevertheless, because the decision to allow the supplemental complaint is unreviewable and not remediable by mandamus relief, we consider the propriety of the decision to the extent it bears on the appropriateness of mandamus relief regarding the TRO. As discussed above, LRFP sought leave to file the supplemental complaint challenging the ADH directive in a pending case. See Little Rock Family Planning Servs. v. Rutledge, No. 4:19-CV-00449-KGB. In that case, LRFP challenged the constitutionality of three separate abortion-related laws in Arkansas. Unlike the ADH directive, none of those laws seek to limit surgical abortions on the basis of the COVID-19 pandemic. Because the ADH directive is distinct and separate from the Arkansas statutes challenged in that case, we express serious doubt that the supplemental complaint challenging the directive "cover[s] matters subsequently occurring but pertaining to the original cause" within the meaning of Rule 15(d). United States v. Vorachek, 563 F.2d 884, 886 (8th Cir. 1977) (internal quotation marks omitted); see also Planned Parenthood of S. Ariz. v. Neely, 130 F.3d 400, 402-03 (9th Cir. 1997) (per curiam) (holding district court abused its discretion in allowing supplemental complaint because "[a]lthough both the original suit and the supplemental complaint sought to challenge Arizona's parental consent law, the supplemental complaint challenged a different statute than the one that had been successfully challenged in the original suit").

Accordingly, we decline to exercise our mandamus power to direct the district court to dismiss the supplemental complaint. We consider the district court's decision to allow the supplemental complaint only for the limited purpose of further demonstrating why mandamus relief regarding the TRO is appropriate.

V.

For these reasons, we grant a writ of mandamus in part and direct the district court to dissolve the TRO of April 14, 2020. We deny the emergency motion to stay the ex parte TRO and for a temporary administrative stay as moot.

LOKEN, Circuit Judge, dissents.

_____